Anthony W. CVELBAR,
Plaintiff–Appellant,

v.

CBI ILLINOIS INCORPORATED,
Defendant–Appellee.

No. 96–1669.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1996.

Decided Feb. 14, 1997.

Julian E. Cannell (argued), David A. Koperski (argued), Kavanagh, Scully, Sudow, White & Frederick, Peoria, IL, for Plaintiff–Appellant.

Stephen D. Gay, Jeffrey A. Ryva, Angela Kay Garrett (argued), Husch & Eppenberger, Peoria, IL, for Defendant–Appellee.

Ellen L. Beard, Department of Labor, Office of the Solicitor, Washington, DC, for Amicus Curiae Robert B. Reich.

Before COFFEY, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Anthony W. Cvelbar signed an agreement with his employer that extended benefits to him in the event of his termination. His employer later merged with the appellee, CBI Illinois Incorporated ("CBI"), which agreed, as part of the merger agreement, to honor the contract. Mr. Cvelbar subsequently was terminated. After paying benefits for some time, CBI invoked the limitation provision of the contract and discontinued the benefits. Mr. Cvelbar brought suit in state court alleging that he was entitled to continued payments under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* After removal, the district court held that the decision to terminate the benefits was not arbitrary or capricious and entered summary judgment in CBI's favor. Mr. Cvelbar now appeals that decision. We conclude that the district court had subject matter jurisdiction and affirm its judgment.

## I

## BACKGROUND

### A. *Facts*

Anthony W. Cvelbar was employed as the Executive Vice President of The First National Bank of Peoria. In March 1990, he entered into an Employer–Employee Agreement ("Agreement") with the bank. That Agreement provided that the bank would pay Mr. Cvelbar severance benefits in the event he was terminated, voluntarily or involuntarily, for any reason other than death, retirement, or the commission of a felony or fraud. The Agreement further provided that Mr. Cvelbar would not compete with First Peoria by accepting employment with a competitor institution for three years following termination. First Peoria entered into similar agreements with four other employees.

Central to this appeal is the interpretation of several provisions of the Agreement. We therefore shall set forth those provisions in more detail. The Agreement stated that its purpose is "to encourage the continued dedication of the management of the Company and its subsidiaries, including [Mr. Cvelbar], to the business of the Company and to discourage [Mr. Cvelbar] from seeking employment with a competitor." R.7, Ex. A at 1. Encouraging loyalty from managers such as Mr. Cvelbar was deemed essential because of such managers' "intimate knowledge of the products, operating procedures and customers" of First Peoria. *Id.*

The three benefits that would be provided to Mr. Cvelbar should he be terminated are

enumerated in the third paragraph of the contract:

(i) The Company shall make available to the Employee and his dependents coverage under the group medical plan on the same terms and conditions as are then available to a retiree of the First Peoria Corp. Retirement Plan in effect at that time.

(ii) The Company shall pay the Employee a lump sum severance payment equal to the lesser of (a) 200% of the Employee's last five-year average annual compensation including any bonuses and director's fees, or (b) 50% of the number of years, or fraction thereof, remaining until the Employee's normal retirement date under the First Peoria Corp. Retirement Plan times the Employee's last five-year average annual compensation including any bonuses and director's fees.

(iii) The Company shall pay the Employee a monthly payment of an amount equal to the deferred pension amount payable under the First Peoria Corp. Retirement Plan at age 65, assuming a life only option, from the date of termination of the Employee's employment until he attains the age of 65 or until he begins receiving benefits under the First Peoria Corp. Retirement Plan, whichever occurs first.

R.7, Ex. A at 3 para. 3. Paragraph four placed a limitation on the payment of any benefits that may become due under the Agreement. The provision, entitled "Limitation on Amounts Payable," provided:

Notwithstanding anything contained in this Agreement to the contrary, in the event any payment to be made or benefit to be provided to the Employee pursuant to this Agreement is deemed, in the sole opinion of Company's counsel, to be contingent on

a "change in ownership or control" or otherwise would be subject to the provisions of Section 280G of the Internal Revenue Code of 1986, as amended (the Code), then the total amount of payments or benefits to be provided to the Employee pursuant to this Agreement shall be reduced so that the aggregate present value of all said payments does not exceed 299% of the Employee's Average Annual Compensation as defined in the Code.

R.7, Ex. A at 3–4 para. 4.A. In addition, First Peoria promised to use its best efforts to require any successor to assume expressly the obligations of the Agreement. Mr. Cvelbar's right to payments was to vest at the time of his termination, and Judith A. Cvelbar was to receive the benefits in the event that Mr. Cvelbar died after termination with benefits remaining.

On June 1, 1992, the bank merged with CBI Illinois, Inc. As a result of the merger, CBI assumed the bank's duties under the Employer–Employee Agreement.[1] CBI terminated Mr. Cvelbar in October 1992. In his affidavit, Peter W. Callow, the President of CBI, testified that he made the decision to terminate because Mr. Cvelbar "exhibited a negative attitude toward the new ownership at Commerce Bank after the merger which took place on June 1, 1992." R.19 at 2. After Mr. Cvelbar's termination, CBI made payments under the Agreement until December 1994. At that time, CBI's counsel, James L. Swarts, determined that, because some of the payments made to Mr. Cvelbar were "contingent on a 'change in ownership or control' or otherwise ... subject to the provisions of Section 280G," the limitation provision contained in paragraph four applied.[2] Therefore, counsel decided, Mr. Cvel-

---

1. Paragraph 12.10 of the merger contract between CBI and First Peoria effected the assumption: "[T]he Surviving Corporation shall honor[ ] the obligations of [First Peoria] under the five written Employer–Employee Agreements...." R.34, Ex.1. This paragraph also provided that CBI would seek a letter ruling from the Internal Revenue Service "with respect to certain legal issues concerning payments" to be made under the Employer–Employee Agreements. *Id.* First Peoria and CBI agreed to accept the resolution of the issues as determined by the IRS.

2. Swarts relied on the legislative history of § 280G, the proposed regulations interpreting § 280G, and the advice of outside counsel. In addition, before making his determination, Swarts reviewed paragraph 12.10 of the merger contract between First Peoria and CBI, *see supra* note 1. He also reviewed the request for a letter ruling that had been prepared in accordance with paragraph 12.10, along with the IRS's response to the request.

The request for a letter ruling dated April 10, 1992 asked whether the payments to be made

bar no longer deserved benefits because he already had been paid more than 299% of his Average Annual Compensation.

### B. *Proceedings in the District Court*

Mr. Cvelbar filed an action in state court alleging that, under ERISA and state contract law, he was due continued benefits. After removal, the district court granted partial summary judgment to CBI and denied partial summary judgment to Mr. Cvelbar. Prior to the district court's grant of partial summary judgment, a magistrate judge, in a report and recommendation to the district court, had concluded that, under the four-part test of *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809 (7th Cir.1994), the Agreement is an ERISA plan, the rights under which can be litigated in federal court. The magistrate judge reasoned that a reasonable person reading the Agreement " 'could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving the benefits.' " R.5 at 3 (quoting *Diak*, 33 F.3d at 812). Before the district court, neither party objected to the magistrate judge's determination, and the district court did not address independently the issue of subject matter jurisdiction.

With respect to the merits, the parties contested whether the benefit payments qualify as "parachute payments" under 26 U.S.C. § 280G. Mr. Cvelbar urged that, because the payments did not constitute such payments, the limitation provision of the Agreement did not apply, and he was entitled to continued payments. However, the district court agreed with CBI that whether the payments to Mr. Cvelbar were actually parachute payments is irrelevant because the Agreement gives discretion to CBI's counsel to resolve that matter. Therefore, the controlling issue, according to the court, was whether CBI's counsel's determination that the payments were contingent on a change in ownership or control was arbitrary or capricious. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–

57, 103 L.Ed.2d 80 (1989). The court held that CBI's interpretation was reasonable in light of the IRS's Proposed Regulations.

In its order rendering partial summary judgment, the district court ordered the parties to submit status reports detailing the issues, if any, that remained to be litigated. In his status report, Mr. Cvelbar submitted that the court ought to determine "what part of the payments [Mr. Cvelbar] received are 'parachute payments.' " R.41. Referring to its earlier order, the district court concluded that this assertion failed to raise issues that were relevant to Mr. Cvelbar's ERISA claim because he had not established that the action of the administrator in terminating payments was arbitrary or capricious. The court then determined that its earlier grant of partial summary judgment had resolved all of the issues between the parties and entered final judgment in favor of CBI.

### II

### DISCUSSION

On appeal, Mr. Cvelbar suggests for the first time that his Agreement is not a "plan" within the meaning of ERISA. He contends that individual contracts between individual employees and employers providing for post-termination benefits do not qualify as "plans" under ERISA. He also maintains that the Agreement does not satisfy our *Diak* test because a reasonable person reading the three benefits-providing clauses could not ascertain the source of funding or the procedures for receiving the benefits. CBI responds that the Agreement is a "top-hat" plan, an ERISA plan that provides benefits for a select group of highly-paid managers.

After studying the briefs of the parties and hearing oral argument, the court invited the Secretary of Labor to submit a brief, as amicus curiae, addressing whether the dis-

---

under the five Employer–Employee Agreements, including Mr. Cvelbar's, would qualify as "parachute payments" under § 280G of the Internal Revenue Code of 1986. In a private letter ruling dated January 8, 1993, the IRS replied that "a

reasonable value attributable to th[e] refraining from performing services [under the Agreements' covenants not to compete] will not be a parachute payment under section 280G(b)(2)(A)." R.34, Ex.3.

trict court had subject matter jurisdiction.[3] In his submission, to which the parties had the opportunity to respond, the Secretary submits that the Agreement is a plan, meeting the requirements of *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) and *Diak*. The Secretary, although pointing out that CBI had agreements similar to Mr. Cvelbar's with five other employees, maintains that an ERISA plan can cover a single employee.

Mr. Cvelbar next asserts that, even if the Agreement is a plan, CBI's termination of benefits was based on an arbitrary or capricious interpretation of the Agreement's limitation provision. Mr. Cvelbar further submits that extrinsic evidence, including the requested letter ruling in which the IRS opined that the part of Mr. Cvelbar's benefits that could be allocated to the covenant not to compete was not covered by § 280G, establishes that counsel's interpretation was unreasonable. CBI, on the other hand, believes that the terms of the Agreement are clear and support the decision of the district court.

We must deal with two issues. First, we must decide whether the federal courts have subject matter jurisdiction over this case on the ground that the Agreement is a "plan" under ERISA. Second, if we determine that ERISA controls, we must determine whether CBI's decision that some of Mr. Cvelbar's benefit payments were contingent on a change in ownership or control or otherwise were covered by 26 U.S.C. § 280G was arbitrary or capricious.

### A. Subject Matter Jurisdiction

■ "[T]he existence of an 'ERISA-governed plan' is an essential precursor to federal jurisdiction." *UIU Severance Pay Trust Fund v. Local Union No. 18–U, United Steelworkers of America,* 998 F.2d 509, 510 n.

2 (7th Cir.1993). Therefore, if Mr. Cvelbar's agreement is not an ERISA "plan," the district court had no subject matter jurisdiction. It is not fatal that Mr. Cvelbar contended in the district court that his agreement is a plan. Nor is it fatal that neither party objected to the magistrate judge's conclusion that the district court had subject matter jurisdiction. Subject matter jurisdiction "cannot be waived or be overcome by an agreement of the parties." *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934). A challenge to subject matter jurisdiction can be raised at any time. Indeed, had Mr. Cvelbar not raised the issue in this appeal, we would have had an independent duty to assess sua sponte our jurisdictional power. *See id.; Stearnes v. Baur's Opera House, Inc.,* 3 F.3d 1142, 1144 (7th Cir.1993).

■ In assessing whether the district court had jurisdiction, we must determine whether the Agreement between Mr. Cvelbar and CBI is an ERISA plan. We begin with the text of the statute. ERISA section 502(a)(1)(B) states that "[a] civil action may be brought—(1) by a participant or beneficiary—(B) to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan...." 29 U.S.C. § 1132(a)(1)(B) (boldface omitted). Section 3(3), in turn, states that "'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both...." 29 U.S.C. § 1002(3). An "employee welfare benefit plan" is "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).[4] An "em-

---

**3.** The Secretary has been charged by Congress with responsibility for interpreting and enforcing the definitional, coverage, reporting and disclosure, and fiduciary responsibility provisions of Title I of ERISA. *See* 29 U.S.C. §§ 1132, 1135. The Secretary therefore has a substantial interest in the proper interpretation of the provisions of ERISA that are at issue in this case.

The court expresses its appreciation to the Secretary for accepting the court's invitation to submit a brief as amicus curiae.

**4.** 29 U.S.C. § 1002(1) provides in full:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care

ployee pension benefit plan" is "any plan, fund, or program ... established or maintained by an employer ... that ... provides retirement income to employees, or ... results in a deferral of income." 29 U.S.C. § 1002(2)(A).[5] Whether we have jurisdiction over this case turns, therefore, on whether the Agreement is a "plan, fund, or program." As the Supreme Court noted in *Fort Halifax*, these statutory definitions are tautological. 482 U.S. at 8, 107 S.Ct. at 2215–16. The statute's definitions of "plan," "employee welfare benefit plan" and "employee pension benefit plan" all contain the word "plan" within their definitions. To complete our analysis, therefore, we must look beyond the language of the statute; the precedents of the Supreme Court, this court, and the other circuits provide additional guidance. Those cases teach that an ERISA plan requires an ongoing administrative scheme, *id.* at 12, 107 S.Ct. at 2217–18, and that its terms must be reasonably ascertainable, *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir.1994).

### 1. Ongoing Administrative Scheme

#### a.

In *Fort Halifax*, the Supreme Court considered a Maine statute that required employers who terminate or relocate operations to pay a lump-sum payment to their employees. The Court held that the Maine statute did not establish, or require employers to maintain, an ERISA plan:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The

employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

482 U.S. at 12, 107 S.Ct. at 2218 (footnote omitted). The lump-sum nature of the Maine obligation weighed heavily in the Court's analysis because an ongoing administrative program typically is required in instances in which there are "ongoing benefits to be paid," *id.* at 14–15 n. 9, 107 S.Ct. at 2219 n. 9, and if there is a "regularity of payment," *id.* at 18 n. 12, 107 S.Ct. at 2221 n. 12.

*Fort Halifax* does not define comprehensively the precise contours of an "ongoing administrative program." The subsequent case law of the circuits, however, has provided significant guidance. For instance, our colleagues in the Eighth Circuit have set forth in a helpful manner the difference between the situation in *Fort Halifax* and those situations that require the implementation of an administrative scheme:

> maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
> > (i) provides retirement income to employees, or
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
> *Id.*

---

> or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).
> *Id.*

5. 29 U.S.C. § 1002(2)(A) provides in full:
> Except as provided in subparagraph (B), the terms "employee benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or

The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1994).

The distinction between situations such as the one confronted by the Supreme Court in *Fort Halifax* and those that are characterized properly as plans is necessarily a "matter of degrees but under *Fort Halifax* degrees are crucial." *Simas v. Quaker Fabric Corp.,* 6 F.3d 849, 853 (1st Cir.1993). As the Secretary of Labor notes, when, as in this case, the judicial task is to distinguish between individual severance benefit contracts and those situations that constitute ERISA plans, some "difficult line-drawing problems" can result. Amicus Br. at 13. For instance, our case law in this area has noted that there can be severance agreements that are properly characterized as simple contracts between an employee and employer and do not constitute plans under ERISA. These contractual arrangements often bind an employer to enroll, or to keep enrolled, an employee in a pension or welfare benefit plan but do not in and of themselves constitute a benefit plan.[6] Other circuits have encountered similar situations.[7] In the case before us, for the reasons set forth in the following paragraphs, we agree with the Secretary that, when assessed in its totality, the arrangement before us does constitute a plan. We cannot accept Mr. Cvelbar's claim that the Agreement is a contract between an employer and individual employee providing for post-retirement or post-termination in-kind compensation that falls outside the definitional framework of ERISA.

b.

In the determination of whether an ERISA plan exists, arrangements that involve a single employee quite understandably have been met with a particularly careful scrutiny. In such situations, it is often more difficult to discern the sort of ongoing administrative management that Congress intended to subject to the regulation of ERISA. At the outset, therefore, we think that it is worth noting that it is not at all clear that it is appropriate to characterize the situation before us as a "one-person" plan. From Mr. Cvelbar's own affidavit, it appears that First Peoria signed similar contracts with four other top employees as part of an effort to retain top management during uncertain economic times. Indeed, the introduction of the Agreement states that its purpose is to obtain the loyalty of management-level employees. When counsel requested an opinion from the IRS about the tax treatment of Mr. Cvelbar's benefits, he referred to four similar contracts. The same mention was made in the First Peoria–CBI merger agreement and

---

**6.** *See Dranchak v. Akzo Nobel Inc.,* 88 F.3d 457, 459 (7th Cir.1996) (noting that it is possible to draft severance agreements that are "unrelated" to a "plan," but noting that contract specifying how much to disburse from pension and welfare trusts in event of discharge is covered by ERISA); *Nagy v. Riblet Prods. Corp.,* 79 F.3d 572 (7th Cir.1996) (holding suit as to whether employee was discharged for "cause" is a state law based employment action despite presence of provision requiring that employee continue to receive all salaries, benefits, bonuses, and other direct and indirect forms of compensation in case of discharge without cause); *Miller v. Taylor Insulation Co.,* 39 F.3d 755 (7th Cir.1994) (discussing contract that required participation in benefit plans as "related" to ERISA plan but not constituting distinct benefit plan).

**7.** *See Delaye v. Agripac, Inc.,* 39 F.3d 235 (9th Cir.1994) (holding that contract calling for the continuation of pay at one of two set formulas depending upon reason for termination and for the continuation of insurance and vacation benefits was not a plan because sending a single employee a check every month and continuing to pay his insurance benefits for a time specified in the contract does not rise to the level of an ongoing scheme), *cert. denied,* — U.S. —, 115 S.Ct. 1402, 131 L.Ed.2d 289 (1995); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3d Cir.1992) (holding that promise to pay lump sum and a year of continuing benefits in exchange for an employee's voluntary departure did not constitute a plan).

in the minutes of meetings of the First Peoria Board of Directors.

 Even if we must characterize the arrangement before us as a one-person plan, we have no difficulty in holding that it is possible for a one-person arrangement to qualify as an ERISA plan. Certainly, the plain language of ERISA in no way excludes from coverage those situations in which only one employee is extended benefits. *See Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir.1991) (also noting that ERISA's predecessor statute expressly excluded plans covering less than 25 employees). "ERISA is clearly a statute of general application, one that envisions inclusion within its ambit as the norm." *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 933 (7th Cir.1989). Moreover, the Department of Labor, although apparently taking a different position in the early days of its administration of the statute,[8] has concluded, and, indeed, reasserts as amicus curiae in this case, that a contract between one employee and an employer can be an employee benefit plan. *See Biggers v. Wittek Indus.*, 4 F.3d 291, 298 (4th Cir.1993) (citing U.S. Dep't of Labor Op. Letter 91–20 A (July 2, 1991) and holding ERISA plan covered one employee); 29 C.F.R. § 2510.3–3(b) ("[A] Keogh plan under which one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under Title I [of ERISA]."). Although the position of the Secretary, even when contained in an opinion letter of the Department, is not binding upon this court, the views of the agency charged with the administration of the stat-

ute carry considerable weight. *See Williams*, 927 F.2d at 1544. We therefore agree with the courts that have decided that, as long as the benefits program meets the other requirements of an ERISA plan—namely, an ongoing administrative scheme and reasonably ascertainable terms—the program does not fall outside the ambit of ERISA merely because it covers only a single employee. *See id.* at 1545 ("[W]e conclude that a plan covering only a single employee, where all other requirements are met, is covered by ERISA.") (footnotes omitted); *cf. Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir.1996) (holding that contract between one top executive and company established a "top-hat" plan). Because we have concluded that the Agreement in this case meets those requirements, its status as an ERISA plan does not evaporate just because the Agreement is a contract between Mr. Cvelbar and the company.

c.

When we turn to a scrutiny of the entire arrangement that Mr. Cvelbar had with his employer, we must conclude that the Agreement constituted a plan to administer the benefits provided. Under the Agreement, the severance benefits were to be provided for three years following termination. Although triggered by the single event of Mr. Cvelbar's termination, the benefits extended to Mr. Cvelbar are not similar to the "one-time, lump-sum payment" considered in *Fort Halifax*, 482 U.S. at 12, 107 S.Ct. at 2218. CBI assumed a "responsibility to pay benefits on a regular basis" and faced "periodic demands on its assets that create a need for

---

**8.** *See* U.S. Dep't of Labor Op. Letter 76–110 (Sept. 28, 1976) (stating that individual contract to provide personal services did not constitute a pension benefit plan under ERISA); U.S. Dep't of Labor Op. Letter 76–79 (May 25, 1976) (stating that the contract under consideration was an employment agreement, not an ERISA plan); *Jervis v. Elerding*, 504 F.Supp. 606, 608 (C.D.Cal. 1980); *see also Fraver v. North Carolina Farm Bureau Mut. Ins. Co.*, 801 F.2d 675, 677–78 (4th Cir.1986) (citing *Jervis* and holding that the buy-out agreements at issue "were simply employment or agency contracts" that do not pay retirement income), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987); *Nechero v. Provident Life & Accident Ins. Co.*, 795 F.Supp. 374, 377 (D.N.M.1992) (citing *Jervis* and stating

that "ERISA does not reach purely individual contracts"); *Lackey v. Whitehall Corp.*, 704 F.Supp. 201, 204 (D.Kan.1988) (citing *Jervis* and holding that contract's "deferred compensation provisions are terms included as part of the employment agreements with select individuals, and not an ERISA covered benefit plan"), *amended by* Civ. A. No. 85–2639–S, 1989 WL 21008 (D.Kan. Feb. 23, 1989); *McQueen v. Salida Coca–Cola Bottling Co.*, 652 F.Supp. 1471, 1472 (D.Colo.1987) (citing *Jervis* and holding that, although *Jervis* did not establish a per se rule that an ERISA plan can never cover just one employee, the deferred compensation agreement at issue was a "personal services contract," not an ERISA plan).

financial coordination and control." *Id.* During the three-year period after termination, the Agreement required that CBI process medical claims, pay medical benefits to Mr. Cvelbar and his dependents, and make a monthly payment. Moreover, the contract in this case placed on First Peoria and CBI an ongoing responsibility to review the contract annually, while Mr. Cvelbar was still employed and the benefits had not yet vested, in order to decide whether to extend its terms for additional years. The companies thus undertook an ongoing responsibility different from that considered in *Fort Halifax* and similar to those the Supreme Court described as requiring an ongoing administrative program. In sum, to carry out the obligations assumed under Mr. Cvelbar's contract, CBI and First Peoria had to do more than merely "write a check." *Id.*

One factor to be considered in deciding "which obligations are complex enough to require" an ongoing administrative program, *Schonholz v. Long Island Jewish Med. Center*, 87 F.3d 72, 76 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996), is "whether the employer's undertaking or obligation requires managerial discretion in its administration." *Id.* (citing *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir.1992), *cert. denied*, 507 U.S. 1031, 113

S.Ct. 1847, 123 L.Ed.2d 471 (1993)); *see James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 468 (2d Cir.1993). Mr. Cvelbar's agreement required the exercise of such discretion. CBI initially had to determine the reason for Mr. Cvelbar's termination.[9] He would not have been eligible for benefits if he had, for example, retired or willfully engaged in fraud. Moreover, the company had to monitor whether Mr. Cvelbar competed against the company within three years of termination. If Mr. Cvelbar breached the covenant not to compete, he would lose the right to benefits and would have to refund any payments that had been made under the Agreement.[10] Once the payments were underway, CBI had to monitor the amount paid to Mr. Cvelbar. If, in the sole opinion of CBI's counsel, any of the payments due under the Agreement were parachute payments, the payments to Mr. Cvelbar were limited to 299% of his Average Annual Compensation. The company also had to reevaluate the Agreement every year to determine whether it should be extended another year. All of these tasks required the exercise of managerial discretion.[11]

The payments to be made to Mr. Cvelbar could not be determined by simple arithmetical computations.[12] The medical benefits

---

9. *See Schonholz*, 87 F.3d at 76 (holding that the plan at issue required more than "simple arithmetical calculations" and necessitated managerial discretion because company had to determine, inter alia, "whether the employee was involuntarily terminated" and "whether the termination was for either illegal conduct or substantially deficient performance"); *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853–54 (1st Cir.1993) (holding that whether an employee was fired "for cause" is a non-mechanical criterion which created the need for administrative obligations); *Bogue*, 976 F.2d at 1323 (similar); *Fontenot v. NL Indus.*, 953 F.2d 960, 963 (5th Cir.1992) (noting that an administrative scheme is required to analyze the circumstances of employee's discharge in light of criteria, but holding that program at issue did not require administrative scheme because employees were to receive benefits regardless of reason for termination).

10. Paragraph 2 of the Agreement provided:

The Employee agrees that for a period of three years from the date of termination, the Employee will not become employed as an agent, consultant, employee, officer or director

of (i) a commercial bank, savings and loan association, savings bank or trust company with an office located in the Standard Metropolitan Statistical Area encompassing the City of Peoria, Illinois, as such area is defined by the U.S. Office of Management and Budget (the Peoria SMSA) or (ii) a bank holding company (as defined in the Bank Holding Company Act, 12 U.S.C. § 1841) which has an office, or has a subsidiary with an office, located in the Peoria SMSA.

If the Employee breaches the terms of this paragraph, this Agreement shall terminate, no payments or benefits shall become payable thereafter, and all payments made under this Agreement shall be refunded by the Employee to the Company.
R.7, Ex.A at 2 para. 2.

11. *See, e.g., Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989) (holding that severance agreements with small number of executives constituted an ERISA plan because it required an administrative scheme).

12. *See James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 468 (2d Cir.1993) (holding that

would vary over time, depending on the health needs of Mr. Cvelbar and his dependents. In addition, the contract extended medical coverage "under the group medical plan on the same terms and conditions as are then available to a retiree of the First Peoria Corp. Retirement Plan in effect at that time." R.7, Ex.A at 3 para. 3(i). Likewise, Mr. Cvelbar's monthly payments were to be "equal to the deferred pension amount payable under the First Peoria Corp. Retirement Plan at age 65, assuming a life only option." Id. at 3 para. 3(iii). The payments were to be made "from the date of termination ... until [Mr. Cvelbar] attain[ed] the age of 65 or until he beg[an] receiving benefits under the First Peoria Corp. Retirement Plan, whichever occur[red] first." Id. To determine Mr. Cvelbar's eligibility and level of benefits, the company had to analyze his circumstances in light of First Peoria's existing retirement plan. The benefits to be paid Mr. Cvelbar therefore could not be calculated mechanically without administrative involvement.[13] By referencing the First Peoria Corp. Retirement Plan, the Agreement not only required that the existing plan be maintained, but it required the company to make administrative determinations about coverage and eligibility, determinations that were not simple mechanical calculations.

### 2. Reasonably Ascertainable Terms

 We have determined that the Agreement necessitated the establishment and maintenance of an ongoing administrative program. In addition, " '[i]n determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for re-

ceiving benefits.' " *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir.1994) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc)).[14] Although the concerns underlying *Diak* are more acute when no writing exists to evidence the plan, a writing, standing alone, is not enough to convert a contract into an ERISA plan.

Some of these criteria are not in serious dispute in this case. A reasonable person easily could ascertain the benefits and beneficiaries of the Agreement. The benefits are listed explicitly in the Agreement. Mr. Cvelbar was to receive medical benefits, a lump-sum payment and a monthly payment. Similarly, the beneficiaries are explicit in the Agreement. The Agreement listed Mr. Cvelbar, his dependents and Judith Cvelbar as beneficiaries.

Mr. Cvelbar nevertheless insists that the source of financing and the procedures for receiving benefits are not reasonably ascertainable. We cannot agree. We held in *Diak* that the "payment of benefits out of general funds satisfies the requirement of an ascertainable source of funding." 33 F.3d at 813. As in *Diak*, a reasonable reading of the Agreement in this case leads to the conclusion that the medical benefits, lump sum and monthly payments were to be paid out of CBI's general funds. Moreover, because the Agreement references First Peoria's existing retirement plan, an examination of that plan would reveal the source of funds for the program upon which Mr. Cvelbar's terms were based.

Lastly, the procedures for Mr. Cvelbar's obtaining benefits were reasonably clear. By the terms of the Agreement, for him to become eligible and for his benefits to vest, Mr.

---

"simple arithmetical calculations and clerical determination" did not require an administrative plan).

**13.** *See Kulinski*, 21 F.3d at 255, 257–58 (noting that analyzing employee's circumstances in light of criteria may necessitate an administrative scheme and holding that agreements that were "entirely self-contained—[they] included no references to any outside criteria or standards"— were not ERISA plans); *Simas*, 6 F.3d at 853 (noting that discretion was involved in statute

that cross-referenced other provisions that required the employer to determine whether the employee was fired for cause).

**14.** Every circuit has adopted the *Donovan* approach for determining whether an ERISA plan has been created. *See Grimo v. Blue Cross/Blue Shield*, 34 F.3d 148, 151 (2d Cir.1994); *Kenney v. Roland Parson Contracting Corp.*, 28 F.3d 1254, 1257–58 (D.C.Cir.1994) (collecting cases from the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth and Tenth Circuits).

Cvelbar would have to be terminated, voluntarily or involuntarily, as conditioned by the contract. He was entitled to a lump sum at the time of his termination. The medical coverage was to be made available at that time, and the terms and conditions of such coverage were contained in the First Peoria Corp. Retirement Plan. In addition, upon termination, he was to receive a payment each month. Consequently, a reasonable person could ascertain the procedures for receiving the Agreement's benefits.

### B. CBI's Decision to Terminate Payments

Mr. Cvelbar challenges CBI's decision to invoke the limitation provision of the Agreement, thereby terminating Mr. Cvelbar's benefits. His "claim for severance benefits is a matter of contract interpretation." *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir.1993). In interpreting the Agreement, the district court was under a duty to determine whether the limitation provision was ambiguous. *Id.* If no ambiguity exists, extrinsic evidence should not be considered, and summary judgment is appropriate. *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir.1989). "A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir.1991).

The limitation provision in this case provided that the present value of the benefits to Mr. Cvelbar would not exceed 299% of his Average Annual Compensation if, "in the sole opinion of Company's counsel," "any payment" provided under the Agreement was "contingent on a 'change in ownership or control' or otherwise . . . subject to the provisions of Section 280G of the Internal Revenue Code of 1986." R.7, Ex.A at 3–4 para. 4.A. CBI's counsel decided that some of the payments to Mr. Cvelbar were so contingent. The district court correctly concluded that the limitation provision was not ambiguous. By its terms, it vests sole discretion in company counsel to determine whether any of Mr. Cvelbar's payments were parachute payments and therefore subject to the limitation provision.

Because the plan vests this discretion in its administrators to construe the limitation provision's terms, "the arbitrary and capricious standard of review is proper." *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir.1993); *Allison v. Dugan*, 951 F.2d 828, 832 (7th Cir.1992); *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). "Under the arbitrary and capricious standard, a denial of benefits will not be set aside if the denial was based upon a reasonable interpretation of the plan documents." *Loyola Univ. of Chicago*, 996 F.2d at 898. "If the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then the administrator's decision is final." *Id.* We emphasize that, in reviewing the determination of CBI's counsel, it is not our function to assess definitively whether we, if faced directly with the § 280G-coverage issue, would reach the same conclusion or even rely on the same authority. We need not decide whether any of Mr. Cvelbar's payments were actually parachute payments; we must decide merely whether such a determination is reasonable and therefore not arbitrary or capricious. It matters not whether counsel's interpretation of the tax laws was actually correct, but whether that interpretation was reasonable. *Cf. Brown v. Rauscher Pierce Refsnes, Inc.*, 994 F.2d 775, 781 (11th Cir.1993) ("For an [arbitration] award to be vacated as arbitrary and capricious, the Panel's award must contain more than an error of law or interpretation."). Without passing on the question whether any of Mr. Cvelbar's payments were parachute payments, we hold that CBI's counsel's determination to that effect was not arbitrary or capricious.

CBI's counsel's determination that some of the benefit payments to Mr. Cvelbar were contingent on a change in ownership or control or otherwise subject to § 280G of the Internal Revenue Code was reasonable. Section 280G defines a "parachute payment" as "any payment in the nature of compensation . . . if—(i) such payment is contingent on a change—(I) in the ownership or effective control of the corporation, or (II) in the ownership of a substantial portion of the

assets of the corporation, and (ii) the aggregate present value of the payments ... exceeds" a certain amount. 26 U.S.C. § 280G(b)(2)(A) (boldface omitted). The legislative history of the section, found in the House Conference Report, contains examples of parachute payments. One of the examples of a payment that is contingent on a change in ownership or control reads:

> Assume that a contract provides for payments to a disqualified individual contingent upon termination of his employment. A change of control occurs, and thereafter, as a result of the change, the employment of the individual is terminated. Payments under the contract are to be treated as contingent on the change in control.

H.R.Conf.Rep. No. 98–861, at 850–51 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1539. This legislative history supports CBI's interpretation of Mr. Cvelbar's payments. His contract made his payments contingent upon his termination. A change in control, a merger, occurred. Mr. Cvelbar's termination resulted because, according to CBI's president, he did not get along with the post-merger management. CBI's interpretation of the Agreement's benefits, therefore, reasonably is supported by the House Conference Report, a document upon which we have relied as an authority in another case, see *Cline v. Commissioner,* 34 F.3d 480, 486 (7th Cir.1994).

In addition to the House Conference Report, the Proposed Regulations provide support for counsel's interpretation of Mr. Cvelbar's benefits. One Proposed Regulation states:

> A payment is also generally treated as contingent on a change of ownership or control if—(1) The payment is contingent on an event that is closely associated with a change in ownership or control, (2) A change in ownership or control actually occurs, and (3) The event is materially related to the change in ownership or control.

Prop.Treas.Reg. § 1.280G–1, Q & A–22(b). The Proposed Regulation lists the termination of employment as an example of "an event that is closely associated with a change in ownership or control." This Proposed Regulation reasonably supports counsel's decision that some of Mr. Cvelbar's payments were contingent on a change in ownership or control: His benefits were contingent on his termination, an event the Proposed Regulation classifies as one closely associated with a change in control. The change actually occurred in the form of a merger. Because Mr. Cvelbar's termination occurred within one year of the merger, according to the Proposed Regulation, it is presumed to be "materially related" to the change in control. *Id.* Apart from the presumption, his termination, in fact, may have been "materially related" to the change in control insofar as Mr. Cvelbar was unhappy with the new management that resulted from the merger.[15]

In his affidavit, CBI's counsel stated that he also relied on the merger contract between CBI and First Peoria, the request for an IRS letter ruling and the letter ruling itself in arriving at his conclusion to terminate Mr. Cvelbar's benefits. The merger agreement required CBI to obtain a ruling from the IRS. That ruling stated that a portion of Mr. Cvelbar's benefits, the portion that could be allocated to the covenant not to compete, was not a parachute payment. Counsel's determination is consistent with the requested letter ruling. The ruling stated that a portion of the payments was not covered by § 280G. The limitation provision of the Agreement applies, however, if "any payment" to Mr. Cvelbar was covered by § 280G. Therefore, our conclusion that counsel's actions were reasonable is not affected by the merger agreement or the letter ruling. Indeed, that counsel examined these documents before coming to a decision bolsters our conclusion that his decision was an informed judgment.

## Conclusion

For the foregoing reasons, the judgment of

---

**15.** *See also* Prop.Treas.Reg. § 1.280G–1, Q & A22(e) (stating, as an example, a situation resembling Mr. Cvelbar's and noting that such payments are presumed to be contingent on a change in control).

the district court is affirmed.[16]

AFFIRMED.

---

16. Mr. Cvelbar also submits that the district court entered summary judgment "sua sponte." The district court, after granting partial summary judgment to CBI, requested that the parties present a statement to the court detailing which issues remained to be litigated. In response, Mr. Cvelbar's only submission was that the court needed to decide "what part of the payments [Mr. Cvelbar] received are 'parachute payments.'" R.41. The district court correctly decided that this submission was irrelevant. Counsel's determination that "any payment" was contingent on a change in ownership or control activated the limitation provision. Therefore, it mattered not what specific portion of Mr. Cvelbar's benefits could be allocated to parachute payments as opposed to payments for the covenant not to compete. Under the plain language of the plan, if any payment was a parachute payment, the total amount of payments was governed by the 299% limit. Because Mr. Cvelbar failed to raise a genuine issue of material fact, summary judgment was appropriate. *See* Fed.R.Civ.P. 56; *Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir.1991) ("Once it becomes clear that additional proceedings are pointless, the court should bring the case to a close."). The district court's entry of final judgment, in response to Mr. Cvelbar's failure, was not erroneous.