Ronald D. DEPEW, Plaintiff,

v.

MNC FINANCIAL, INC.,
et al., Defendants.

Civ. A. No. WN–92–1780.

United States District Court,
D. Maryland.

March 9, 1993.

Benjamin Rosenberg, Douglas J. Furlong, Rosenberg, Proutt, Funk & Greenberg, Baltimore, MD, for plaintiff.

Jeffrey P. Ayres, Stanley Mazaroff, Venable, Baetjer & Howard, Baltimore, MD, for defendants.

## ORDER

NICKERSON, District Judge.

Upon consideration of the Report and Recommendation dated March 3, 1993, by United States Magistrate Judge Catherine C. Blake, having been advised that the parties will not be filing written objections to the Report and Recommendation, it is by the Court, this 9th day of March, 1993,

ORDERED, that the Report and Recommendation is adopted in its entirety; and it is further

ORDERED, that the above-captioned case is hereby remanded to the Circuit Court for Baltimore City; and it is further

ORDERED, that costs (but not attorneys' fees) are awarded to Plaintiff.

## REPORT AND RECOMMENDATION

BLAKE, United States Magistrate Judge.

Now pending is the motion of plaintiff Ronald D. Depew ("Depew") for remand of his complaint against defendants MNC Financial, Inc. ("MNC") and South Charles Realty Corp. ("SCRC"). Mr. Depew filed suit in the Circuit Court for Baltimore City on May 26, 1992, alleging breach of employment contract (Count I) and negligent misrepresentation (Count II). The defendants removed the case to this court on June 24, 1992, asserting that "one or more of the employment-related obligations underlying Counts I and II ... are ERISA plans, and Counts I and II relate to an ERISA plan or plans, such that Mr. Depew's entire case is removable to this Court pursuant to 28 U.S.C. § 1441 and [§] 1446." (Defendants' Notice of Removal at 2–3) (footnote omitted).

Depew filed a motion to remand on August 3, 1992, which was followed by defendants' opposition and plaintiff's reply and request for a hearing.[1] On November 25, 1992, the case was referred to the undersigned Magistrate Judge, and oral argument was heard on January 14, 1993. Several post-hearing letters were submitted by both sides. For the reasons set forth below, I will recommend that the motion for remand be granted.

As set forth in the complaint, Depew alleges that in September 1990 he was induced to relocate from California to Maryland to take a position as executive vice president of a new real estate liquidation unit (SCRC) being formed at MNC. As part of the employment contract, he was offered the opportunity to earn aggregate after-tax bonuses of $1.3 million from an incentive program payable over the life of the liquidation project. After he began work, he was told that this program had been replaced by two other incentive plans, but was assured these plans would still provide the opportunity to earn the same net bonus over the estimated seven-year life of SCRC. These plans were designated as the "Annual Performance Incentive Plan" and the "Key Manager Reserve Incentive Plan."[2]

Depew understood that he was being hired for the full life of the asset liquidation project. On March 13, 1992, however, he was terminated from his employment with SCRC. He sued for bonus compensation not paid and loss of future income.

Central to the motion for remand is the plaintiff's contention that neither the Annual Performance Plan nor the Key Manager Plan fall within the coverage of the Employer Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA").[3] To be covered by ERISA, a plan must meet the definition of either an "employee welfare benefit plan" or an "employee pension plan." As defined by the statute, an employee welfare benefit plan includes:

> any plan, fund, or program which was ... established or maintained by an employer or an employee organization ... *for the purpose of* providing for its participants or their beneficiaries ... (A) medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, death, or unemployment, or vacation benefits ... or (B) any benefit described in section 186(c) of this title[4] (other than

1. Judge William M. Nickerson ordered discovery to proceed during the pendency of the motion to remand.

2. Copies were attached as Exhibits A and B to the defendants' Notice of Removal.

3. Depew also contends that, even if the plans come under ERISA, his claims are not preempted, because the plans at issue only provide a measure of damages and are not directly affected by his complaint. *See Pizlo v. Bethlehem Steel,*

884 F.2d 116 (4th Cir.1989). In light of my conclusion that the plans are not covered by ERISA, I do not reach this issue.

4. According to 29 C.F.R. section 2510.3–1(a)(3), the benefits described in section 186(c) include "those plans which provide holiday and severance benefits and benefits which are similar (for example, benefits which are in substance severance benefits, although not so characterized)." *Id.*

pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. section 1002(1) (emphasis added). In contrast, an employee pension plan consists of:

any plan, fund or program ... established or maintained by an employer ... [which], by its express terms or as a result of surrounding circumstances ...—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. section 1002(2)(A). Not included in this definition, however, are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. section 2510.3–2(c).

■ Applying these statutory provisions, I find that neither the Annual Performance Incentive Plan nor the Key Manager Reserve Incentive Plan qualify as ERISA-covered plans. In both cases, the Plans' identically-stated express purpose is:

to aid the organization in attracting and retaining key personnel in critical management positions to make a contribution to the timely reduction of the organization's non-performing assets. This plan provides a means for the payment of incentives for the sustained achievement of the recovery objectives which have been set in response to the organization's strategic goals.

(Defendants' Opposition to Plaintiff's Motion to Remand, Exhibit A, at 1; Exhibit B, at 1). Neither has a stated purpose of providing severance, retirement, death, or disability benefits.

The Annual Performance Plan, which applies to a greater number of employees, was to be funded annually in an amount based on the sale of non-performing assets within that year. Assuming a minimum amount was reached, management was to make individual incentive awards to the participants based on "each individual's contribution to the overall results attained by the South Charles Realty Corporation." (*Id.*, Exhibit B, at 4). The plan was to be in effect from January 1991 "until the level of the non-performing assets have been significantly reduced." (*Id.*, at 2). Plan participants whose employment terminated due to death, disability, retirement, or transfer were eligible to receive a pro-rated incentive based on the number of months worked prior to termination; employees who left voluntarily or were terminated for cause forfeited all such awards. (*Id.*, at 1).

The Key Manager Plan, for which fewer employees were eligible, also had an annual funding mechanism and also was to be in effect from January 1991 "until the level of the non-performing assets have been significantly reduced." (*Id.*, Exhibit A at 2). Distribution of the Key Manager incentive pool of funds, however, was not to occur until:

1) The discontinuance of the South Charles Realty Corporation's Annual Performance Incentive Plan in which all of this Plan's participants partake.

2) The South Charles Realty Corporation's release of an individual plan participant(s) prior to the discontinuance of the Annual Performance Plan due to general business considerations.

Employees voluntarily terminating employment, or terminated for cause or performance are excluded from participation. Employees terminated due to death or disability would be eligible to participate.

(*Id.*)

■ Defendants argue that both Plans qualify as welfare benefit plans because they provide payments upon unemployment, severance, disability or death. (Defendants' Opposition at 12 *et seq.*). Although the Plans permit a participant to maintain eligibility for pro-rated payments despite death, disability, or certain kinds of termination, their primary purpose is to provide incentives payable either annually, under the Annual Performance

plan, or when the level of non-performing assets has been significantly reduced, under the Key Manager plan. While the meaning of "significantly reduced" is nowhere defined in either plan, it does not necessarily or practically imply either termination of an individual's employment or dissolution of SCRC.[5] Rather, the Key Manager plan is designed to provide benefits payable in the later years of the project, when funds would no longer be accumulating in a substantial amount in the annual performance plan. This is consistent with Depew's contention that the defendants wanted to keep him on the job throughout the entire life of the project.

In addition to the arguments cited above, defendants also maintain that the Key Manager Plan falls within the definition of an employee welfare benefit plan because it provides " 'benefits which are in substance severance benefits, although not so characterized.' " (Defendants' Opposition at 15, quoting 29 C.F.R. section 2510.3–1(a)(3)).[6] While plan benefits may be payable upon "release of an individual plan participant(s) . . . due to general business considerations," they are not distributable solely upon the occurrence of this event. As the plan indicates, the first event triggering payments under the Key Reserve plan is "[t]he discontinuance of the . . . Annual Performance Incentive Plan . . . ." (Defendants' Opposition, Exhibit A at 2). Since this discontinuance is not the equivalent of a termination, defendants' benefits cannot be considered "benefits which are in substance severance benefits." 29 C.F.R. section 2510.3–1(a)(3).

■ The defendants also argue that the Plans qualify as employee pension plans under ERISA. Neither of these plans, however, requires deferral of income until the termination of Depew's employment or thereafter. Indeed, Depew received a payment under the Annual Performance plan while he was still employed by SCRC. (Letter from Benjamin Rosenberg dated January 19, 1993).

As for defendants' argument that the Key Manager Plan "result[s] in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . "[7] (Defendants' Opposition, at 20–

---

5. By letter dated January 19, 1993, the defendants rely on the language of a "Key Manager's Reserve Incentive Plan Summary," apparently provided to Depew. The summary provides for distribution upon "1) overall termination of Realty Corp's business charter; 2) release of individual Plan participant due to business considerations. . . ." (Letter from Jeffrey P. Ayres dated January 19, 1993; attachment). As Depew's testimony indicates, however this summary represents only one version of the plan; besides this version, Mr. Depew reviewed "other versions at various other times." (Letter from Mr. Ayres dated January 20, 1993; Tr. Vol. III, at 129). The fact that this summary language does not appear in the final version of the plan itself indicates a deliberate decision on the part of the plan's authors not to tie payment distributions to the overall termination of Realty Corp's business charter. Similarly, the decision to connect distribution under the Key Manager Reserve Incentive Plan with a significant reduction in the level of non-performing assets indicates an attempt by the plan's authors to afford themselves greater flexibility in the timing of payments under the plan. In light of the difference in language between the summary and the finalized version of the plan, I find the summary unpersuasive on the issue of whether payment under the plan would occur only upon termination of Depew's employment.

6. In support of this argument, defendants rely on *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140 (4th Cir.1985), summarily aff'd. *sub nom. Brooks v. Burlington Industries, Inc.*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559, *cert. denied*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). In the *Holland* case, however, the benefits at issue were acknowledged by all parties to be severance benefits, for which the most relevant eligibility requirement was "job termination" (*id.* at 1144); thus, *Holland* does not control the present case.

7. In support of this argument, defendants rely on *Darden v. Nationwide Mut. Ins. Co.*, 922 F.2d 203, 207–08 (4th Cir.1991), *cert. denied in pertinent part*, —— U.S. ——, 112 S.Ct. 295, 116 L.Ed.2d 240, *rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) and *Healy v. Rich Products Corp.*, 13 BNA Emp. Ben. Cases 2083, 1991 WL 46514 (W.D.N.Y. 1991). In *Darden* the plan at issue, known as the "Deferred Compensation Plan," qualified as an "employee pension plan" because one of its purposes, according to both the defendant's literature and its witnesses, was "to provide retirement benefits;" 922 F.2d at 207; in addition, payment under the plan was deferred until the termination of employment. *Id.* Such facts differ from the situation here, given that: (1) the purpose of the Key Manager Plan is to "aid [SCRC] in attracting and retaining key personnel

21), a review of the Plan's language does not support this assertion. As noted above, payments under the Key Manager Plan would occur upon either one of two qualifying events, namely:

> 1) The discontinuance of the South Charles Realty Corporation's Annual Performance Incentive Plan....

> [or]

> 2) The South Charles Realty Corporation's release of an individual plan participant(s) ... due to general business considerations.

(Defendants' Opposition, Exhibit A, at 2). While payment pursuant to the second qualifying event would, by definition, be deferred until the termination of covered employment, payment pursuant to the first qualifying event would not. With the discontinuance of the Annual Performance Plan tied to a significant reduction in the level of non-performing assets, payments pursuant to the first qualifying event could occur prior to the termination of covered employment, subsequent to the termination of covered employment, or both. As stated in a case very similar to this one, "[t]he statute is not satisfied when, under the facts of a particular case, a portion of withheld income [may happen] to become due after termination." *Hagel v. United Land Co.*, 759 F.Supp. 1199, 1202 (E.D.Va.1991); *see also Fraver v. North Carolina Farm Bureau Mutual Ins. Co.*, 801 F.2d 675, 678 (4th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir.1980). Accordingly, neither the Annual Performance Plan nor the Key Manager Plan should be construed as an employee pension plan under ERISA.

A better characterization of both plans would be a bonus program, as defined by 29 C.F.R. section 2510.3–2(c). With a stated purpose of "provid[ing] a means for the payment of *incentives* for the sustained achievement of the recovery objectives" (Defendants' Opposition, Exhibit A, at 1) (emphasis added), both plans expressly qualify as "a bonus for work performed;" 29 C.F.R. § 2510.3–2(c); when combined with the fact that payments under the plans are not "systematically deferred to the termination of covered employment or beyond" (*id.*), the appropriateness of defining them as a bonus program becomes even more apparent. *Hagel*, 759 F.Supp. at 1202; *see also Murphy*, 611 F.2d at 575–76.

If successful in obtaining remand, Depew requests an award of costs, expenses, and attorney fees under 28 U.S.C. § 1447(c). (Motion to Remand, at 2). While it does not appear that the statute as amended in 1988 requires a showing of bad faith, neither is an award of fees automatic. In light of the federal question raised by defendants, I recommend an award of costs but not attorneys' fees to Depew. *See Penrod Drilling Corp. v. Granite State Ins. Co.*, 764 F.Supp. 1146, 1147 (S.D.Tex.1990); *cf. Harford Co., MD v. Harford Mutual Ins. Co.*, 749 F.Supp. 701, 705 (D.Md.1990).

For the reasons cited above, it is hereby recommended under 28 U.S.C. § 1447(c) that: (1) plaintiff's motion to remand be granted; and (2) costs but no fees be awarded.

March 3, 1993

... [by] provid[ing] a means for the payment of incentives for the sustained achievement of recovery objectives ...;" (Defendants' Opposition' Exhibit A, at 1); and (2) payment under the plan does not necessarily occur at the termination of employment.

*Healy* is inapplicable for similar reasons. In that case one of the plans at issue, the Deferred Compensation Plan, provided for the payment of annual benefits "following ... retirement," or "upon disability, death or certain other termination;" 1991 WL 46514, at 1; the other plan, known as the Incentive Compensation Plan, provided for benefit payments upon "retirement, death, or disability." *Id.* From these provisions, the court determined that both plans qualified as "employee pension benefit plans" under ERISA since they provided " 'retirement income' and/or 'a deferral of income.' " *Id.* at 3. Considering that the benefits under the Key Manager Plan may be paid prior to the termination of employment, *Healy* also does not control in this case.