Richard KAELIN, Plaintiff,

v.

TENNECO, INC., Tenneco Packaging, Tenneco Key Employee Restricted Stock Plan 1992, Tenneco Key Employee Restricted Stock Plan 1993, 1994 Tenneco, Inc. Restricted Stock Ownership Plan, and John Potempa, Administrator, Defendants.

No. 96 CV 2333.

United States District Court,
N.D. Illinois,
Eastern Division.

March 16, 1998.

---

### MEMORANDUM AND ORDER

MANNING, District Judge.

This case arises from plaintiff Richard Kaelin's claims that he is entitled to Tenneco, Inc. stock pursuant to ERISA, the Illinois Wage Payment and Collection Act, and Illinois contract law. Defendants Tenneco, Inc. ("Tenneco"), Tenneco Packaging ("Packaging"), Tenneco Key Employee Restricted Stock Plan 1992, Tenneco Key Employee Restricted Stock Plan 1993, 1994 Tenneco, Inc. Restricted Stock Ownership Plan, and John Potempa seek summary judgment pursuant to Fed.R.Civ.P. 56. Kaelin has filed a cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56.[1]

---

1. The court notes that the binding obliterates the page numbers of portions of the deposition excerpts supporting Kaelin's Local Rule 12 statement. Counsel is admonished to ensure that duplication in any future pleadings filed with this court does not repeat this problem.

For the following reasons, Packaging's stock plan is not a plan as defined by ERISA. Accordingly, Kaelin's ERISA claims are dismissed for lack of jurisdiction, his state law claims are dismissed without prejudice, and the motions for summary judgment are denied as moot.

## I. BACKGROUND

The essential facts are undisputed.

### A. The Plans

In 1988, Tenneco established the Key Employee Restricted Stock and Restricted Unit Plan (the "1988 Plan") to provide incentives for key employees to continue working for Tenneco and its affiliated companies. (Df.¶ 11). In 1994, Tenneco created the 1994 Tenneco, Inc. Stock Ownership Plan (the "1994 Plan"). None of the differences between the 1988 and the 1994 Plans are material to this case.

The 1988 and 1994 Plans provided grants of blocks of stock to certain employees, subject to certain restrictions. The stated purpose of the 1988 Plan was to:

promote the long-term success of the Tenneco Companies by providing proprietary incentives to key employees who are in positions to make significant contributions toward such success. The Plan is designed to attract individuals of outstanding ability to employment with the Tenneco Companies and to encourage key employees to continue employment with the Tenneco Companies, and to render superior performance during such employment.

(Df.¶ 11).

In turn, the stated purpose of the 1994 Plan was to:

promote the long-term success of the Tenneco Companies for the benefit of the Company's shareholders by encouraging its officers and key employees to have meaningful investments in the Company so that, as stockholders themselves, those individuals will be more likely to represent the views and interests of other stockholders and by providing incentives to such officers and key employees for continued service. The Company believes that the

possibility of participation under the Plan will provide this group of officers and employees an incentive to perform more effectively and will assist the Company and the Tenneco Companies in attracting and retaining people of outstanding training, experience, and ability.

(Df.¶ 22).

This case centers around Kaelin's 1992, 1993, 1994, and 1995 stock grants, which total 6,450 shares of stock, and which are worth over $300,000. Each grant contained the following language:

If you remain employed by the Tenneco Companies throughout the Restricted Period and all the conditions are satisfied, or if your employment terminates before the expiration of the Restricted Period as a result of your Retirement, Death, or Total Disability (all as defined in the Plan), the restrictions will lapse, and the award shares will be delivered to you (or your beneficiary, subject to withholding for taxes). Generally, if your employment terminates for any other reason before the expiration of the Restricted Period, you will forfeit the Award shares unless the Committee decides otherwise.

(Pltf.Ex. 3, 4, 5, 5a).

Stock grants pursuant to the 1988 Plan were accompanied with question and answer forms which stated, in pertinent part:

Q: WHAT IF I TERMINATE EMPLOYMENT DURING THE RESTRICTION PERIOD?

A: If you terminate employment due to retirement, disability or death, the restrictions will lapse as of the date of termination and you or your estate will be free to dispose of the shares. If you terminate for any other reason (i.e., quit, separation, etc) you will forfeit the shares, unless the Board's Compensation and Benefits Committee, in its sole discretion, determines that such termination is consistent with the purposes of the Plan (i.e., early retirement).

The 1994 Plan contained a substantially similar question and answer form which

changed the word "retirement" in the first sentence to "normal retirement (age 65)."

Pursuant to the Plans, employees do not vest in the restricted stock and the restricted stock is forfeited unless the employee is employed by Packaging four years after the award or the employee's employment terminates due to death, disability, or retirement. (Df.¶ 14, 18–20, 25, 27, 28). According to the plans, "retirement" means the grantee terminates employment when, under Tenneco's retirement plan, the grantee is eligible to receive an immediately payable normal retirement benefit. (Df.¶ 15, 26). Normal retirement benefits are payable under Tenneco's retirement plan only if the employee terminates employment on or after his or her 65th birthday. (Df.¶ 16).

Tenneco provided recipients of restricted stock with a memo explaining that: "If your employment with a Tenneco company is terminated for any reason other than for normal retirement, total disability or death prior to the expiration of the restriction period, your shares will be forfeited unless determined otherwise by the Tenneco, Inc. Compensation and Benefits Committee." (Df.¶ 28).

The parties agree that Kaelin's 1992, 1993, 1994, and 1995 stock had not vested when he took early retirement. They dispute, however, whether he should have nevertheless received his stock. Kaelin's position, essentially, is that Packaging singled him out and excluded him from a group of early retirees who were granted early vesting status when they took early retirement. Kaelin contends that Packaging imposed conditions on the contracts between Kaelin and the stock plans by requesting that he enter into non-compete and consulting agreements. He argues that these conditions prevented him from getting the stock that he otherwise would have received when he took early retirement. In support of these arguments, Kaelin points to other former Packaging employees who took early retirement and allegedly nevertheless received their unvested stock options.

It is undisputed, however, that the Compensation and Benefits Committee of the Board of Directors of Tenneco has unfettered discretion with respect to grants, restrictions, and waiver of restriction. (Df.¶ 12, 18, 23,

25). Thus, the Committee has the discretion to waive the restrictions on the shares of an employee who has not vested. (Df.¶ 18, 25, 31). In practice, the Committee only vests Packaging employees early if the Vice President, Employee Relations and Administration for Packaging so recommends. (Df.¶ 32).

The parties disagree as to how this decision is made. According to the defendants, in making this decision, the Vice President, Employee Relations and Administration consults with the employee's supervisor regarding this decision and what conditions should be imposed upon the employee if Packaging allows early vesting. Conditions are based on the company's need, if any, resulting from the employee's departure. (Df.¶ 33, 34). Kaelin, however, cites to evidence demonstrating that Barry Schuman, Senior Vice President, Human Resources, also participated in the decision-making process. (Pltf. Ex. 10, p. 850; Ex. 15).

### B. Kaelin's Employment with Tenneco and Packaging

Beginning in 1986, Kaelin was a Vice President of Sales at Tenneco Packaging, a subsidiary of Tenneco. As Vice President of Sales, Kaelin was a key employee who was awarded restricted stock every year from 1988 to 1995. (Df.¶ 38–34). He vested in and received his 1988 restricted stock in 1992, because he continued to work at Tenneco Packaging until after the four-year restriction period expired. (Df.¶ 38). Similarly, he vested in and received his 1989 restricted stock in 1993, and vested in and received his 1990 restricted stock in 1994. (Df.¶ 39, 40).

In Fall, 1994, Kaelin met with his supervisor Richard Wambold, then Senior Vice President, and John Potempa, Vice President, Employee Relations and Administration, to discuss the possibility of taking early retirement. (Df ¶ 46; Pltf. Ex. 17 at 32–35). Potempa told Kaelin that he would not have a right to the restricted stock that had not vested if he resigned or took early retirement. (Df.¶ 47, 48). Kaelin also testified that Potempa told him that no one who takes

early retirement gets their stock. (Pltf. Ex. 17, Kaelin Dep. at 53–55). Kaelin did not elect to take early retirement at that time.

In March, 1995, Kaelin met again with Wambold. According to Kaelin, Wambold proposed that Kaelin take early retirement without the need to take a broker position in Kentucky, act as a consultant at a salary of $50,000/year for two years, and sign a non-compete agreement that would be effective for three years. (Pltf. Ex. 17, Kaelin Dep. 64–66). On March 1, 1995, Kaelin applied for early retirement effective April 1, 1995. (Pltf.Ex. 16). Because Kaelin's 1991 stock award was issued in March, 1991, Kaelin had vested as to that stock. However, his 1992, 1993, 1994, and 1995 stock had not vested as of April 1, 1995. (Df.¶ 42–45).

After Kaelin's meeting with Wambold, Wambold spoke with Potempa about Kaelin's impending departure, including the non-vested stock. Potempa told Wambold to consider what he needed to ensure a smooth transition, and to consider whether Kaelin should be allowed to vest early with respect to his 1992, 1993, 1994, and 1995 stock. Wambold determined that, due to Kaelin's experience, knowledge of Packaging's products and procedures, and his close relationship with Packaging's customers, he needed two things to ensure a smooth transition: (1) a non-compete agreement; and (2) a part-time consulting agreement pursuant to which Kaelin would assist his replacement and introduce him or her to Packaging's customers. Wambold felt these conditions were necessary to prevent Packaging from losing customers and to allow Kaelin's replacement to establish customer relationships quickly. (Df.¶ 51, 53).

Wambold subsequently met with Potempa. They decided that, if Kaelin would agree to the conditions, he would vest in his 1992, 1993, 1994, and 1995 stock. (Df.¶ 53). Kaelin did not agree to the conditions. Instead, he accepted a position with Penny Plate, a direct competitor of Packaging. (Pltf. Ex. 7; Df. ¶ 61–63). On April 5, 1995, Potempa signed a document indicating that Kaelin had forfeited his 1992, 1993, 1994, and 1995 stock by taking early retirement. (Pltf.Ex. 6).

Kaelin later found out that other Packaging executives who had taken early retirement had received all their restricted stock despite the fact that they had not vested. (Pltf. Ex. 17, Kaelin Dep. at 121, 163). Thus, he wrote to Packaging regarding his stock. Packaging responded by pointing out that Kaelin had elected early retirement and thus was not eligible to receive his non-vested stock. (Pltf.Ex. 9). Kaelin appealed to Tenneco's benefits division in Texas, exhausting his administrative remedies, and received another copy of the letter regarding Kaelin's early retirement. Subsequently, Kaelin filed this action.

## C. The Parties' Positions

Kaelin contends that this court has jurisdiction over this case because Packaging's stock plans are "top hat" plans under ERISA. 29 U.S.C. § 1101(a)(1). Kaelin notes that "top hat" plans are exempt from ERISA's requirements except with respect to reporting, disclosure and civil enforcement. He thus asks the court to construe Packaging's plan under federal common law as a unilateral contract, citing to *In re New Valley Corp.*, 89 F.3d 143 (3d Cir.1996). Kaelin argues that he is entitled to summary judgment because the defendants decided not to allow him to receive his stock based on reasons not stated in the Plans (his decision not to enter into a consulting and non-compete agreements) and thus breached their contractual obligations.

The defendants argue that Kaelin is not entitled to unvested restricted stock under ERISA because the Plans at issue are not employee benefit plans under ERISA. Because the Plans are not ERISA plans, the defendants request dismissal of the Tenneco Key Employee Restricted Stock Plan 1992, Tenneco Key Employee Restricted Stock Plan 1993 and 1994 Tenneco Inc. Stock Ownership Plan as they are not legal entitles that can be sued. The defendants also argue that Kaelin is not entitled to the stock under contract law or the Illinois Wage Payment and Collection Act, 820 ILCS 115/2. In support of this argument, they contend that Kaelin cannot establish a right to the stock, given that he had not vested at the time of

his early retirement, and thus had no entitlement to the stock.

## II. DISCUSSION

### A. Standard for A Motion For Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading"; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir.1992), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti v. Qualex, Inc.*, 970 F.2d at 365; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505.

### B. Jurisdiction—Are the Restricted Stock Plans ERISA Plans?

■ Kaelin claims that this court has jurisdiction over this case because he seeks to enforce his rights in a "top hat" plan. Under ERISA, "top hat" programs are agreements between corporations and their top executives. *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1) (special rules for "top hat" programs). Specifically, these plans are "unfunded and exist primarily to provide benefits to a select group of management or highly compensated employees." *Fasco Industries, Inc. v. Mack*, 843 F.Supp. 1252, 1255 (N.D.Ill.1994), *citing* 29 U.S.C. § 1101(a)(1).

■ In this Circuit, the existence of an ERISA-governed plan "is an essential precursor to federal jurisdiction." *Cvelbar v.*

*CBI Illinois Inc.*, 106 F.3d 1368, 1373 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997), *citing UIU Severance Pay Trust Fund v. Local Union 18–U*, 998 F.2d 509, 510 n. 2 (7th Cir.1993). Because this issue is jurisdictional, the court cannot consider the merits of Kaelin's claims unless Packaging's stock plans are "plans" under ERISA. *See Kulinski v. Medtronic Bio–Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir.1994). Thus, the court's threshold determination regarding federal subject matter jurisdiction subsumes the main issue in this case—whether Packaging's stock option plan is within the ambit of ERISA.

#### 1. Relevant Provisions of ERISA

Section 502(a)(1)(B) of ERISA provides that "[a] civil action may be brought ... (1) by a participant or beneficiary ...(B) to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan .... " 29 U.S.C. § 1132(a)(1)(B). Section 3(3) of ERISA defines the terms "employee benefit plan" or "plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).

An "employee welfare benefit plan" is:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment ...

29 U.S.C. § 1002(1).

In turn, an "employee pension benefit plan" is:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program (i) provides retire-

ment income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . .

29 U.S.C. § 1002(2)(A). An employee pension benefit plan does not include "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or as to provide retirement income for employees." 29 C.F.R. § 2510.3.2(C).

### 2. Must a "Top Hat" Plan Also Be an "Employee Welfare Benefit Plan" and/or an "Employee Pension Benefit Plan"?

█ The critical question is whether Packaging's restricted stock plans are "employee benefit plans" or "plans" under ERISA. Whether a plan exists within the meaning of ERISA is a "question of fact, to be answered in light of all of the surrounding facts and circumstances from the point of view of a reasonable person." *Bass v. Mid-America Co., Inc.,* 95 CV 1167, 1995 WL 622397 *2 (N.D.Ill. Oct. 20, 1995), *citing Deibler v. United Food & Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir. 1992). Moreover, coverage under ERISA is liberally construed, and exemptions from ERISA are applied narrowly. *See Brundage–Peterson v. Compcare Health Services Ins. Corp.,* 877 F.2d 509, 511 (7th Cir.1989).

█ The defendants contend that a "top hat" plan is a subset of employee benefit plans under ERISA and that "top hat" plans, therefore, must also be employee welfare benefit plans and/or employee pension benefit plans to be covered by ERISA. In contrast, Kaelin argues that Packaging's restricted stock plans are "top hat" plans under ERISA because they are reasonably ascertainable "plans" restricted to a select group of highly compensated employees that defer income and use retirement as an eligibility criteria. In other words, Kaelin argues that Packaging's plan does not necessarily have to be an ERISA welfare or pension plan to be an ERISA "top hat" plan. For the following reasons, the court agrees with the defendants

that "top hat" plans are a subset of the two recognized types of ERISA plans—welfare or pension plans—rather than a third class of "plans."

First, as noted above, § 3(3) of ERISA defines the terms "employee benefit plan" or "plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). As the Supreme Court and the Seventh Circuit have noted, this definition is tautological since the defined term and the definition each include the word "plan." *Cvelbar v. CBI Inc.,* 106 F.3d at 1374, *citing Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 8, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). *See also Strzelecki v. Schwarz Paper Co.,* 824 F.Supp. 821, 826 (N.D.Ill.1993) ("the directive that a 'plan' is a kind of 'plan' [is] of limited help.") Nevertheless, ERISA's reference to welfare and pension plans implies that ERISA does not encompass plans which are neither welfare nor pension plans.

Second, the Supreme Court has held that there are only two kinds of plans under ERISA, stating that "ERISA defines a 'plan' to include both 'an employee welfare benefit plan [and] and employee pension benefit plan.'" *Inter–Modal Rail Employees Ass'n. v. Atchison, Topeka & Santa Fe Railway Co.,* 520 U.S. 510, ——, 117 S.Ct. 1513, 1515, 137 L.Ed.2d 763 (1997). *Accord American Fed. of Grain Millers v. International Multifoods Corp.,* 116 F.3d 976, 979 (2d Cir.1997) ("ERISA contemplates two distinct kinds of employee benefit plans—pension plans and welfare plans"); *In re Unisys Corp.,* 58 F.3d 896, 901 (3d Cir.1995) ("ERISA recognizes two types of employee benefits, welfare benefits and pension benefits"); *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 574 (5th Cir.1980) ("ERISA applies only to 'an employee welfare benefit plan or an employee pension benefit plan or a plan which is both.'") *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1510 (10th Cir.1996) ("ERISA distinguishes between two types of employment benefits, welfare benefits and pension benefits"); *Williams v. Wright,* 927 F.2d 1540, 1542 (11th Cir.1991) (ERISA recognizes two types

of plans, "employee welfare benefit plans" and "employee pension benefit plans"). The plain meaning of the statutory definition of plan—"an employee welfare benefit plan" and/or "an employee pension benefit plan"— implies that a plan must be a welfare and/or a pension plan to qualify as an ERISA "plan." 29 U.S.C. § 1002(3).

Third, while the Seventh Circuit has not considered this precise issue, its recent opinion in *Cvelbar v. CBI Illinois, Inc.*, 106 F.3d 1368 (7th Cir.1997), is helpful. In *Cvelbar*, the Seventh Circuit considered whether a severance package qualified as an ERISA plan. The severance benefits in *Cvelbar* were payable if the employee was terminated, voluntarily or involuntarily, for any reason other than death, retirement, or the commission of a felony or a fraud. The agreement between the company and the employee regarding the severance benefits also required the employee to sign a three-year non-compete agreement. *Id.* at 1370.

The severance package in *Cvelbar* included: (1) coverage for the employee and his dependents under the employer's group medical plan; (2) a lump sum severance payment; and (3) a monthly payment equal to the amount of the employee's deferred pension amount payable under the company's retirement plan until the employee reaches the age of 65 or otherwise begins receiving benefits under the retirement plan. *Id.* at 1371.

The Seventh Circuit held that the company's severance package would only be an ERISA plan if it was: (1) part of an ongoing administrative scheme, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. at 12, 107 S.Ct. 2211; and (2) contained reasonably ascertainable terms, *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir.1994). *Cvelbar v. CBI Inc.*, 106 F.3d at 1374. In other words, the Seventh Circuit did not specifically consider whether the severance package also had to be a welfare and/or pension plan to be a plan under ERISA.

This court, however, believes that the reasoning in *Cvelbar* is wholly consistent with such a requirement. In *Cvelbar*, the Seventh Circuit expressly stated that an ERISA "plan, fund, or program" is an employee welfare and/or pension plan. *Id.* at 1373. In addition, it is entirely reasonable for the Seventh Circuit not to discuss whether the plan was a welfare and/or pension plan because the plan in *Cvelbar* contained elements of both. Specifically, the plan provided medical benefits to Cvelbar and his family. It also allowed Cvelbar to receive his retirement benefits under the company's retirement plan early.

Thus, the question in *Cvelbar* was whether the agreement containing the severance package was part of the requisite administrative scheme and had the reasonably ascertainable terms necessary to be an ERISA plan. This court believes that the nature of the plan at issue in *Cvelbar* led to the Seventh Circuit's focus on whether the administrative scheme and reasonably ascertainable term requirements had been met. The Seventh Circuit's discussion of the welfare/pension aspects of the severance package and its specific reference to the definition of a "plan" and a welfare and/or pension plan, in this court's opinion, means that the Seventh Circuit would require a plan to have a welfare or pension element to qualify as an ERISA plan.

Fourth, courts in this district have held that unfunded plans maintained primarily to provide deferred compensation for a select group of employees are not "top hat" plans unless they otherwise qualify as an ERISA plan. *Bass v. Mid–America Co.*, No. 95 CV 1167, 1995 WL 622397 (N.D. Ill. Oct. 20 1994) ("[w]ithin the category of employee pension benefit plans fall 'top hat' plans ... "); *Fasco Industries, Inc. v. Mack*, 843 F.Supp., at 1254 ("[w]ithin the category of employee pension benefit plans, the [plan at issue in the case] is of the type commonly referred to as a 'top hat' plan").

Finally, Kaelin has failed to point to any specific statutory provision which provides that "top hat" plans are a third type of ERISA plan. He has, however, directed the court's attention to *Carr v. First Nationwide Bank*, 816 F.Supp. 1476, 1486, 1488 (N.D.Cal. 1993). In *Carr*, the district court held, without explanation, that "[e]xecutive deferred compensation plans such as the Bank's Plan fall into neither category [welfare or pension

plans], but are nevertheless governed by ERISA." *Id.* at 1486.

This court does not find the holding in *Carr* persuasive, especially in light of the considerations discussed above. Kaelin's characterization of Packaging's plan as an ERISA "top hat" plan due to the fact that it is unfunded and exists primarily to provide benefits to a select group of highly compensated employees is, therefore, unavailing. To sum up, unless Packaging's plan is a pension or welfare plan under ERISA, this court lacks jurisdiction over this case.

### 3. Is Packaging's Plan an "Employee Welfare Benefit Plan" and/or an "Employee Pension Benefit Plan"?

#### a. Employee Welfare Benefit Plan

■ The defendants contend that Packaging's plan is not an "employee welfare benefit plans" because it is not established or maintained for the purpose of providing "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment ..." 29 U.S.C. § 1002(1). The court agrees. Providing stock options to certain employees as part of their compensation package is wholly unrelated to medical benefits, or benefits for sickness, accident, disability, death, or unemployment. *See Brundage–Peterson v. Compcare Health Services Ins. Corp.*, 877 F.2d 509, 510–11 (7th Cir.1989).

#### b. Employee Pension Benefit Plan

■ The question of whether Packaging's plan is an "employee pension benefit plan" is closer. Employee pension benefit plans under ERISA provide retirement income to employees, or allow employees to defer income for periods extending to the termination of covered employment or beyond. 29 U.S.C. § 1002(2)(A). An employer does not create an employee pension benefit plan merely by making payments to employees under a bonus system "unless such payments are systematically deferred to the termination of covered employment or beyond, or as to provide retirement income for employees." 29 C.F.R. § 2510.3–2(c). Thus, the granting of stock options to key employ-

ees does not necessarily equate to a pension plan under ERISA.

Although the Seventh Circuit has not considered this issue, other courts' decisions regarding similar plans are instructive. For example, the Fifth Circuit has held that a system of discretionary bonuses consisting of a royalty on specific projects was not an ERISA plan because the bonuses were in addition to regular compensation and were meant to reward employees with present benefits. *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574–576 (5th Cir.1980). The court specifically noted that the fact that payments could continue after retirement did not mean that the payments were systematically deferred to the termination of covered employment or beyond. *Id.* at 576.

Similarly, the Tenth Circuit has held that a plan which provided employees with bonuses based on their sales of insurance pursuant to a vesting schedule was not an ERISA pension plan because it did not provide for the systematic deferral of payment. *McKinsey v. Sentry Insurance*, 986 F.2d 401, 405–06 (10th Cir.1993). The Eleventh Circuit has held that a plan is a pension plan within the meaning of ERISA only if it was designed to provide retirement income, not if it was meant to convey property to an employee and some payments might occur after retirement. *Williams v. Wright*, 927 F.2d 1540, 1546–47 (11th Cir.1991).

A number of district courts also agree that stock or bonus plans that might lead to post-retirement payments are not ERISA pension plans. *See Goodrich v. CML Fiberoptics, Inc.*, 990 F.Supp. 48 (D.Mass.1998) (dismissing case for failure to state a claim under ERISA where employee claims that he was discharged to prevent him from taking advantage of a stock option program, as program was neither a welfare nor a pension plan); *Lafian v. Electronic Data Systems Corp.*, 856 F.Supp. 339 (E.D.Mich.1994) (stock option plan was not a pension plan under ERISA because it was not specifically designed to provide retirement income and did not systematically defer income past the termination of employment); *Depew v. MNC Financial, Inc.*, 819 F.Supp. 492, 494–96 (D.Md.1993) (performance incentive and key

manager reserve incentive plans were not ERISA plans because they were meant to attract and retain key personnel and provide incentives to perform rather than welfare or pension plans); *Hagel v. United Land Co.,* 759 F.Supp. 1199 (E.D.Va.1991) (override bonus agreement was not a welfare or pension plan under ERISA because the plan was meant to defer profit sharing income for tax purposes, not to defer payments to the termination of covered employment or beyond); *Johnson v. TCOM Systems, Inc.,* Civ. A. No. 89–0311(RCL), 1989 WL 517870 (D.D.C. Dec. 19, 1989) (stock option plan subject to vesting schedule was not an ERISA plan because restrictions on stock did not track ERISA's requirement that payment be systematically deferred to the termination of covered employment).

Here, Packaging's plan did not allow the employees to receive the full economic benefit of the stock options until the vesting period had passed. Thus, the plan did not provide immediate compensation to the covered employees. However, the court believes this is a distinction without a difference. The vesting provision was not meant to allow employees to receive the stock as a retirement benefit and it clearly did not lead to systematic deferral of payment until after the termination of covered employment. Instead, it provided benefits to employees who remained employees for four years after Packaging granted them blocks of stock. To sum up, Kaelin has provided the court with no argument or authority sufficient to persuade the court that Packaging's plan is an ERISA pension plan. Because the plan was not specifically designed to provide retirement income and did not systematically defer income past the termination of employment, the court concludes that the plan is not a pension plan under ERISA.

**4. Is Packaging's Plan Part of an Ongoing Administrative Scheme and Does it Contain Reasonably Ascertainable Terms?**

Even if this court incorrectly predicted that the Seventh Circuit would require a plan to be either a welfare or pension plan to fall within the ambit of ERISA, and a plan is an ERISA plan simply if it is part of an ongoing administrative scheme and contains reasonably ascertainable terms, the court would still find that Packaging's plan is not a plan as defined by ERISA. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. at 12, 107 S.Ct. 2211; *Diak v. Dwyer, Costello & Knox, P.C.,* 33 F.3d 809, 812 (7th Cir.1994). Packaging's plan did not require an ongoing administrative scheme requirement because computation of Kaelin's benefits was non-discretionary. Payment of a specified amount at the time of vesting simply is not an employee benefit plan. *Fort Halifax Packing Co. v. Coyne,* 482 U.S. at 12, 107 S.Ct. 2211 ("the requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation"); *Kulinski v. Medtronic Bio-Medicus, Inc.,* 21 F.3d 254, 256–58 (8th Cir.1994) (golden parachute plan was not covered by ERISA because implementation of the plan did not require an ongoing administrative scheme).

Kaelin attempts to avoid this difficulty by focusing on the fact that the agreement provides that "[g]enerally, if your employment terminates for any other reason before the expiration of the Restricted Period, you will forfeit the Award shares unless the Committee decides otherwise." He argues that discretionary determinations as to whether Packaging would waive the vesting provisions required an ongoing administrative scheme.

This court disagrees. The ongoing administrative scheme contemplated by *Fort Halifax* and its progeny exists where an employer "undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. at 9, 107 S.Ct. 2211. The decision regarding waiver of the vesting provision is not logically part of this type of an administrative scheme because, according to the plain language of the contract, it is wholly within Packaging's discretion.

488

In other words, Kaelin is not entitled to his unvested stock unless and until Packaging decides, in its discretion, to waive the vesting provision. This is clearly different from a situation where an employer owes an employee a benefit if certain conditions are met and has an administrative scheme in place which determines when those benefits are owed and how they are paid.

To clarify this distinction, envision a claim for a welfare benefit, such as a health care claim. Pursuant to an administrative scheme, the employer first determines if the employee is eligible (*i.e.,* covered by the plan). Then, it calculates the benefits owed, makes the appropriate disbursement, monitors funds available for benefit payments, and complies with applicable reporting requirements. In contrast, the eligibility of a Packaging employee who elects early retirement does not turn on whether he or she is covered by a plan. Instead, it turns on whether Packaging opts to make a purely discretionary decision on a case-by-case basis regarding waiver of the vesting provision. Thus, there is no ongoing administrative scheme and no ERISA "plan."

### C. Kaelin's State Law Claims

■ This court declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367. First, because there is no ERISA-governed plan, this court lacks original jurisdiction over the federal claims in the first instance. *See Cvelbar v. CBI Illinois Inc.,* 106 F.3d 1368, 1373 (7th Cir.1997) (existence of ERISA plan "is an essential precursor to federal jurisdiction"), *UIU Severance Pay Trust Fund v. Local 18–U,* 998 F.2d at 510 n. 2. Moreover, this court has focused on the jurisdictional issues presented by this case and has not devoted any resources to the merits of Kaelin's remaining claims. Finally, the parties can likely use the discovery regarding the state law claims in any subsequent state court case. *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251–52 (7th Cir. 1994). Thus, the court will not consider Kaelin's state law claims.

### D. Filings Under Seal

■ The parties have filed their Rule 12 statements entirely under seal, allegedly pursuant to the protective orders previously entered in this case. This is permissible only where the entire document is confidential. *Methodist Hospitals, Inc. v. Sullivan,* 91 F.3d 1026, 1031–32 (7th Cir.1996); *Pepsico v. Redmond,* 46 F.3d 29, 31 (7th Cir.1995) (Easterbrook, J. in chambers); *In re Krynicki,* 983 F.2d 74, 75 (7th Cir.1992) (Easterbrook, J. in chambers).

■ The parties' filings clearly are not 100% confidential. Thus, the parties should have filed either a public document with an accompanying sealed supplement or a sealed document with an accompanying public redacted version of that document. In light of the court's dismissal of this case for lack of jurisdiction, however, the court will not order the parties to redo their pleadings at this time.

### III. CONCLUSION

For the above reasons, Packaging's stock plan is not a plan as defined by ERISA because it is neither a welfare nor a pension plan. Alternatively, Packaging's stock plan is not a plan as defined by ERISA because implementation of the plan did not require an ongoing administrative scheme. Accordingly, the court lacks jurisdiction over this action. Therefore, Kaelin's ERISA claims are dismissed for lack of jurisdiction and the defendants' motion for summary judgment [# 26–1] is granted. It is further ordered that Kaelin's state law claims are dismissed without prejudice, and Kaelin's motion for summary judgment [# 31–1] is denied as moot.