Wesley H. ADAMCZYK, et al., Plaintiffs,

v.

**LEVER BROTHERS COMPANY,**
a division of Conopco, a
corporation, Defendant.

No. 97 C 1332.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 27, 1998.

Reubèn A. Bernick, Cohon, Raizes & Regal, Chicago, IL, Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for Plaintiffs.

Terry James Smith, Thomas Andrew Christensen, Brian Ross Carnie, Chad W. Moeller, Kessler Smith & Powen, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

The ten plaintiffs in this case are all former employees of defendant Lever Brothers Company. Plaintiffs worked at defendant's Hammond, Indiana plant and all voluntarily retired in 1995, the earliest on May 1 and the latest on October 1. Plaintiffs claim that de-

fendant violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by failing to adequately inform plaintiffs of a voluntary termination package ("VTP") that allegedly was "under consideration" before their retirement, but did not become available until after they retired.[1] The VTP provided for an election period in December 1995 with the effective retirement date being December 31, 1995, or later depending on the company's needs. Alternatively, plaintiffs contend that defendant's actions violated state law. Presently pending are cross motions for summary judgment.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Valance v. Wisel,* 110 F.3d 1269, 1274 (7th Cir.1997); *Patel v. Allstate Insurance Co.,* 105 F.3d 365, 367 (7th Cir.1997). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which the nonmovant will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:

*Adamczyk v. Lever Brothers Co.,* 991 F.Supp. 931 (N.D.Ill.1997).

---

1. See this court's opinion denying in part and granting in part defendant's motion to dismiss.

The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, [106 S.Ct. 2548, 91 L.Ed.2d 265] (1986); *id.* at 325, [106 S.Ct. 2548] ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324, [106 S.Ct. 2548]. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, [106 S.Ct. 1348, 89 L.Ed.2d 538] (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, [106 S.Ct. 2505, 91 L.Ed.2d 202] (1986). *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

Defendant raises various grounds for dismissal. It contends that its obligations to disclose are limited by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, because the VTP was a mandatory subject of bargaining under the collective bargaining agreement ("CBA") applicable to plaintiffs' employment. Defendant also contends that the claims are preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, because the claims are dependent on interpretation of the CBA. It contends that any claim under § 301 is barred by the applicable statute of limitations and because plaintiffs failed to pursue the grievance procedure provided for in the CBA.

To the extent the claims are to be considered under ERISA, defendant contends the claims fail for a number of other reasons as well. It contends that (a) the VTP is not a plan as that term is defined by ERISA; (b) plaintiffs are only entitled to equitable relief under the pertinent ERISA provision, but are instead seeking monetary damages; (c) plaintiffs failed to pursue the internal remedies available for benefits disputes; (d) defendant's denial of VTP benefits was not arbitrary and capricious; (e) defendant was not acting as a fiduciary; (f) Seventh Circuit law did not require disclosure of the VTP while it was under consideration; and (g) even if the serious consideration doctrine adopted by other circuits is the law of the Seventh Circuit, the VTP did not reach the level of serious consideration until after most plaintiffs had retired and, as to other plaintiffs, the VTP was adequately disclosed prior to their retirement, and, further, all communications with plaintiffs were truthful or any misstatements were negligent which is an insufficient basis for a fiduciary breach. As to the state law claims, defendant contends they are either preempted by federal law or fail on their merits because any possible state law claims require proof of intentional misrepresentations.

Local General Rule 12(M) requires that the party moving for summary judgment provide a statement consisting of numbered paragraphs that recites all the facts the movant contends are undisputed with citations to the record in support of each asserted fact. Under Local General Rule 12(N)(3)(a), the nonmovant is required to provide a paragraph-by-paragraph response either admitting the facts asserted are uncontested or

pointing to support for any fact for which it is contended there is a genuine dispute. The nonmovant may also provide a statement of any additional facts it believes require the denial of summary judgment. *Id.* Rule 12(N)(3)(b). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* Compliance with these rules not only makes it possible for the court to determine whether there are genuine factual disputes, it also makes it easier for the parties to prepare their answer and reply and helps ensure that each party's contentions will be clearly conveyed.

Plaintiffs failed to comply with Rule 12(N)(3)(a). Instead, plaintiffs provided a Rule 12(M) Statement with footnotes providing cross references to plaintiffs' disagreements with defendant's Rule 12(M) Statement. Although failing to comply with Rule 12(N)(3)(a), plaintiffs did provide a statement with supporting citations controverting facts asserted in defendant's Rule 12(M) Statement. Therefore, all the facts set forth in defendant's Rule 12(M) Statement will not automatically be deemed admitted; the assertions of controverted fact contained in plaintiffs' Rule 12(M) Statement will be considered.[2]

Defendant's motion for summary judgment will be considered first. Unless otherwise noted, the facts set forth below draw all reasonable inferences and resolve all genuine factual disputes in plaintiffs' favor.

The contentions that raise questions as to the court's jurisdiction will be considered first. The VTP must be a plan in order that there be ERISA jurisdiction. *Cvelbar v. CBI Illinois Inc.,* 106 F.3d 1368, 1373 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997); *UIU Severance Pay Trust Fund v. Local Union No. 18–U, United Steelworkers of America,* 998 F.2d 509, 510 & n. 2 (7th Cir.1993); *Malone v. Leaf, Inc.,* 1997 WL 583072 *3 (N.D.Ill. Sept. 12, 1997); *Bongiorno v. Associates in Adolescent Psychiatry, S.C.,* 1993 WL 313096 *4

(N.D.Ill. Aug. 13, 1993). To the extent plaintiffs' claims are for breach of fiduciary duty, defendant's fiduciary status is also a jurisdictional requirement for plaintiffs' ERISA claims. *Bozeman v. Provident National Assurance Co.,* 1992 WL 328804 *2 (W.D.Tenn. May 15, 1992). *Cf. Bromenn Healthcare v. Northwestern National Life Insurance Co.,* 806 F.Supp. 799, 803 (C.D.Ill.1992). Defendant does not dispute that it is a fiduciary, only whether any communications from Lever Brothers employees that plaintiffs' rely on in making their claims are attributable to defendant in its fiduciary capacity. That is not a jurisdictional issue. Section 301 preemption could deprive this court of jurisdiction under ERISA, but the complete preemption doctrine would establish federal jurisdiction under § 301. *See Atchley v. Heritage Cable Vision Associates,* 101 F.3d 495, 498 (7th Cir.1996).

As to the questions that are jurisdictional, factual disputes may be resolved if necessary and appropriate. *See English v. Cowell,* 10 F.3d 434, 437 (7th Cir.1993); *Weidner Communications, Inc. v. H.R.H. Prince Bandar Al Faisal,* 859 F.2d 1302, 1310 n. 11 (7th Cir.1988); *Crawford v. United States,* 796 F.2d 924, 928–29 (7th Cir.1986). Where appropriate, factual determinations may be made on documentary submissions. *See Crawford,* 796 F.2d at 929. Summary judgment rules do not apply, but may be considered in determining whether there is any substantial dispute that requires consideration of oral testimony. *See id.* at 928. Still, any rational mode of inquiry will do. *Id.* at 929. Additionally, where the jurisdictional issue is intertwined with the merits of the case, it is sometimes appropriate to postpone to the time of trial resolution of the jurisdictional issue. *See id.; Gruen Marketing Corp. v. Benrus Watch Co.,* 955 F.Supp. 979, 982 (N.D.Ill.1997).

 First, it must be considered whether plaintiffs' claims are actually § 301 claims as defendant contends. Section 301 confers federal jurisdiction for suits based on violations of contracts between an employer and a

---

**2.** Counsel for plaintiffs are admonished to fully comply with the dictates of Local Rule 12(N). Full compliance helps to ensure that none of counsel's assertions are lost in a disorganized presentation.

labor organization. It has been held that § 301's preemptive force is complete, placing any state law claims under § 301 even if a plaintiff characterizes it as a different claim. *Atchley*, 101 F.3d at 498. Section 301 preempts claims that are "directly founded on or 'substantially dependent on analysis of a collective-bargaining agreement.'" *Id.* (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)). If the resolution of a claim depends on the meaning of, or requires the interpretation of, a CBA, federal labor law principles must be employed to resolve the dispute. *Atchley*, 101 F.3d at 499. But not every case in which a CBA comes into play is governed by § 301. When interpretation of a term of the CBA is unnecessary, the claim is not one under § 301. *See id.*

All the plaintiffs were members of the Oil, Chemical and Atomic Workers Union Local 7–336 (the "Union"). Defendant intended to terminate Heavy Duty Laundry Liquid ("HDL") operations at its Hammond plant and relocate some or all of those operations to its Baltimore plant. The applicable CBA provided for certain benefits in the event of layoff. Defendant entered into negotiations with the Union regarding the relocation and termination pay. An agreement was reached between defendant and the Union which included the terms of the VTP. The VTP provides the same lump sum payment as would be available under the CBA for a layoff, plus an additional $5,000. Defendant contends § 301 preemption applies because the VTP is a contract between an employer and labor union and plaintiffs' claims require interpretation of the VTP.

Although not cited by either party, in the context of a criminal case, the Seventh Circuit recently considered the question of whether § 301 can preempt other federal statutes, including ERISA.[3] *See United States v. Palumbo Brothers, Inc.*, 145 F.3d 850 (7th Cir.1998). Initially, the Seventh Circuit noted that it is a cardinal principle of statutory construction that, where there are two federal statutes concerning the same subject, the goal is to give effect to both. *Id.* at 862. *See also id.* at 875–76. It was further stated that "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." *Id.* at 864 (quoting *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)). It was held that "the uniform policies of labor law and the preemptive force of § 301 do not apply if the claim concerns labor issues that only are tangential to the resolution of the central dispute." *Palumbo Brothers*, 145 F.3d at 864. Defendants in *Palumbo Brothers* were charged with criminal violations of ERISA for false statements made in documents and reports required by ERISA. *See id.* at 873. The false reports were about contributions to funds that were obligations under a CBA. Nevertheless, the falsity of the defendants' statements could be determined without making the CBA a subject of the dispute. *See id.* at 875. It was held that the ERISA charges were not preempted. *Id.* at 873–76.

The present case is similar to *Palumbo Brothers*. At most, a labor agreement is tangentially related to plaintiffs' claims. There is no dispute about the interpretation or application of the VTP. Plaintiffs do not claim that the terms of the VTP apply to them. They concede that they retired too early to directly claim any benefits under the VTP. There is also no apparent dispute about

---

**3.** Defendant cites *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1536 (3d Cir.1992), and incorrectly describes it as holding that § 301 preempted both the state law and ERISA claims made in that case. *Angst*, however, actually held that the buyout plan involved in that case was not an ERISA plan and therefore there could be no ERISA claim and it was unnecessary to resolve questions as to the interaction between ERISA and § 301. *Id.* at 1538. Research has disclosed only one case holding that an ERISA claim was preempted by § 301. *See Franks v. O'Connor Corp.*, 1992 WL 301266 *5 (E.D.Pa. Oct. 16, 1992). Two other cases hold § 301's preemptive force is limited to state law claims and therefore ERISA claims are not preempted by § 301. *See Almonte v. General Motors Corp.*, 1997 WL 363815 *2 (E.D.N.Y. June 30, 1997); *Scotto v. Brink's Inc.*, 751 F.Supp. 335, 339 (E.D.N.Y. 1990), *rev'd on other grounds*, 962 F.2d 225 (2d Cir.1992). This court, however, is bound to follow the Seventh Circuit's holding in *Palumbo Brothers*.

any benefits calculation. To the extent plaintiffs are entitled to recover the amounts they would have received had they been covered by the VTP, there is apparently no disagreement as to how to calculate that amount. The dispute concerns whether defendant should have disclosed that the VTP was under serious consideration; there is no dispute over the terms of the VTP. Since no interpretation of the terms of a labor agreement is in dispute, the VTP is, at most, tangential to the ERISA claims made. Section 301 does not preempt any ERISA claim.

■ The next question to consider is whether the VTP is a plan as that term is used in ERISA. Defendant contends that the VTP is not a plan because it lacks an ongoing administrative scheme and does not provide benefits on a regular and long-term basis. Under the terms of the VTP, retirement-eligible employees had from December 4, 1995 through December 8, 1995 to voluntarily agree to retire. Those not yet eligible to retire, could agree to voluntarily terminate their employment either during that time period or from December 18, 1995 through December 23, 1995.[4] The two election periods also coincided with election periods for the exercise of bumping rights by those whose positions were being eliminated. Employees eligible for termination benefits were to be limited to the number of positions eliminated, including limitations within each craft. Retirements were to be effective December 31, 1995. However, the company retained the right to keep a retirement-eligible worker in a non-employee status with the same pay and duties for as long at that worker's services were needed. Those not eligible to retire remained as employees until the company determined their services were no longer needed. Those who elected voluntary termination received a lump sum based on years of service, age, and base hourly rate which was identical to the sum provided for under the CBA in the event of a layoff. Those who voluntarily terminated also received an additional $5,000. There is no specific provision for continuation of health and other benefits. Retirees received the same retirement benefits, including health coverage, for which they would otherwise have been eligible. Terminating employees waived any recall rights.

■ An employer's unfunded provision for severance benefits can qualify as a welfare benefit plan under ERISA. *Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1045 (7th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). A welfare benefit plan "requires five elements: (1) a plan, fund or program, (2) established or maintained, (3) by an employer ..., (4) for the purpose of providing ... severance benefits, (5) to participants or their beneficiaries." *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.*, 805 F.2d 732, 738 (7th Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). *Accord Stamm v. Provident Life & Accident Insurance Co.*, 1998 WL 596700 *4 (N.D.Ill. Sept. 2, 1998); *Fiene v. V & J Foods, Inc.*, 962 F.Supp. 1172, 1178 (E.D.Wis.1997). *See also Cvelbar*, 106 F.3d at 1373. Clearly, the last three elements are satisfied. The first element is also clearly satisfied in that a written agreement with the Union and written communications from defendant to its employees set forth a basis for ascertaining the intended benefits, the beneficiaries, how the benefits were financed, and procedures for receiving benefits. *See Cvelbar*, 106 F.3d at 1378. Defendant's only contention is that the second element is not satisfied.

■ In considering whether the second element is satisfied, it must be determined whether the VTP was complex enough to require an ongoing administrative program. *See Cvelbar*, 106 F.3d at 1374, 1378; *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir.1998).

> The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employ-

---

4. The November 30, 1995 letter to employees providing information about the VTP (Def.Exh. C) refers to "Friday, December 23, 1995." That was actually Saturday. It is unknown whether the intended date was Friday December 22 or Saturday December 23.

er's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Cvelbar,* 106 F.3d at 1375 (quoting *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1994)).

Defendant primarily relies on the fact that each employee accepting the VTP receives only a single lump sum payment. In *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Supreme Court stated: "The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." In *Collins,* 147 F.3d at 595–96, the Seventh Circuit recognized, however, that it was also important in *Fort Halifax* that all the employees affected by the closing of the plant were affected by a single, qualifying event and that all the payments were to be made at the same time.

The present case involves a situation that is more complex than that involved in *Fort Halifax.* Not all employees were entitled to receive their payments at the same time. Retirees were to become eligible for their VTP benefits upon retiring December 31, 1995. Those not eligible for retirement would not be entitled to their lump sum until they actually terminated their employment when their particular department was closed. Such employees' payments could not even be calculated until they actually completed their employment since the total payment depended on length of service as well as hourly rate at the time of termination. In *Collins,* 147 F.3d at 596, the fact that payments to employees could occur sporadically over a one-year period was one, if not a sufficient, factor distinguishing *Collins* from *Fort Halifax.*

The present case is also distinguishable from *Fort Halifax* in that there was not a single event making all participants eligible for benefits. *Compare also Collins,* 147 F.3d

at 596–97. There were two different election periods involved. In between the election periods, defendant was to inform employees about the effect of the initial bumping period so that they could also take that into consideration in making their decisions. Not every employee who elected the VTP was going to be included. Defendant still had to make a determination of who was entitled to receive termination benefits based on who applied and the positions being terminated. Therefore, a mechanical calculation of benefits was not the only administration involved. Also, even if the employee was determined to be eligible for termination benefits, the employee's actual date of termination had to be determined at a later date. Therefore, someone had to determine when to make the termination payments and had to identify the employees who had qualified for benefits. Additional administrative tasks included placing voluntary retirees whose services were still needed into a non-employee status and excluding voluntary terminations from any recall list.

Because the VTP required payments at various times and various administrative tasks in order to determine eligibility, when to make payments, and employee status, the VTP involved an ongoing administrative scheme. The VTP is a welfare benefit plan as that term is used in ERISA.

■ In ruling on defendant's motion to dismiss, it was held that the "serious consideration" standard adopted by other circuits is the appropriate rule to follow in this circuit as well. *See Adamczyk v. Lever Brothers Co.,* 991 F.Supp. 931, 936 (N.D.Ill.1997). No subsequent decisions of the Seventh Circuit reject that standard. Once an employer seriously considers offering a severance package, it is precluded from making any misleading statements about such package. Before considering the full parameters of the serious consideration standard, it must be decided whether the present case is different because it involves a severance package that was a subject of bargaining under a CBA. Defendant contends that applying the serious consideration standard in the present situation would require that it commit an unfair labor

practice in violation of §§ 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (5).

Just as with § 301 and ERISA, the goal is to give effect to both the NLRA and ERISA. *Palumbo Brothers,* 145 F.3d at 862. Therefore, in determining the parameters of the serious consideration standard, the limits of fair labor practice must be taken into account. Section 8(a)(1) prohibits interfering with an employee's rights to organize collectively (*see* 29 U.S.C. § 157) and § 8(a)(5) prohibits refusing to bargain with a duly recognized union. Contrary to defendant's contention, informing employees that the employer is seriously considering a severance package that will first need to be the subject of collective bargaining does not constitute an unfair labor practice. *See Fischer v. Philadelphia Electric Co.,* 96 F.3d 1533, 1539 (3d Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997) ("An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan. Rather, its obligation is to answer participants' questions forthrightly, a duty that does not require the fiduciary to disclose its internal deliberations nor interfere with the substantive aspects of the collective bargaining process."); *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 669 (2d Cir.1994) (fiduciary not required "to disclose its internal deliberations or to interfere with the substantive aspects of the collective bargaining process.")

The cases cited by defendant involve situations where the employer offered or negotiated severance packages directly with unionized employees or attempted to undermine negotiations that were being undertaken with the union. *See NLRB v. Baltimore News American,* 590 F.2d 554 (4th Cir.1979) (while union was still attempting to negotiate the terms of a voluntary termination program, the employer offered the program to its employees); *Toledo Typographical Union No. 63 v. NLRB,* 907 F.2d 1220, 1222 (D.C.Cir. 1990), *cert. denied,* 498 U.S. 1053, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991) ("an employer that negotiates directly with an individual employee, without first bargaining with the union, violates § 8(a)(5)"); [5] *Detroit Edison Co.,* 310 NLRB 564 (1993) (in the midst of conducting discussions regarding phasing out positions, the employer sent a letter directly to employees containing a proposal that had not yet been presented to the union in an attempt to undermine the union or its bargaining position); [6] *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1536 (3d Cir.1992) (buyout plan negotiations are only to be between the union and employer, and not with the individual employee). Defendant could have informed its employees that the VTP was under consideration without negotiating the terms of the VTP, seeking acceptance of the VTP by particular employees, or undermining the Union's position in bargaining the VTP. The NLRA does not preclude application of the serious consideration standard. However, in applying that standard when a CBA is involved, care must be taken that the standard is not construed in a manner that conflicts with NLRA prohibitions on unfair labor practices. In this case, such a problem is unlikely to arise because the only misrepresentations made subsequent to serious consideration occurred after an initial agreement had been reached with the Union. [7]

On defendant's motion to dismiss, it was held that plaintiffs failed to satisfy Rule

---

5. Defendant cites *Toledo Blade Co.,* 295 NLRB 626 (1989), without noting that it was reviewed and remanded by *Toledo Typographical.* Moreover, there is no holding or *dictum* in *Toledo Blade* that an "employer [is] prohibited from communicating directly with employees on proposals to implement early retirement incentives." Def. Memo. in Support at 4. The issue in *Toledo Blade* was whether the employer had negotiated in good faith in seeking a clause permitting it to negotiate retirement issues directly with employees. The NLRB found that the employer had bargained in good faith and the D.C. Circuit held that it had not.

6. The NLRB indicated the employer did "more than ... distribute[ ] an innocuous memorandum to Marysville employees that outlined its SPPO phaseout proposal." *Detroit Edison,* 310 NLRB at —— n. 2, 1993 WL 62321.

7. As is discussed below, the only material misrepresentations were those made to plaintiff David Brubaker on September 20, 1995. An agreement with the Union was reached on September 18, 1995. That agreement, though, left defendant with some discretion in implementing it. Therefore, a possibility remained for further negotiations.

9(b)'s pleading requirements for intentional misrepresentations. Therefore, any claims based on intentional misrepresentation were dismissed. *Adamczyk*, 991 F.Supp. at 939. Plaintiffs later amended their complaint and again alleged intentional misrepresentations. At the time leave was granted to file the Second Amended Complaint, the parties were instructed to defer any issues regarding the adequacies of the pleadings and proceed with discovery. Defendant now raises its argument that the Second Amended Complaint fails to plead intentional misrepresentations with sufficient particularity. The Second Amended Complaint, however, contains an affidavit from each plaintiff setting forth with sufficient particularity the pertinent communications, the participants, and the dates. Plaintiffs satisfied Rule 9(b).

It was previously held that negligent misrepresentations are cognizable as fiduciary violations under ERISA. *Id.* at 938–39. Defendant contends that a subsequent Seventh Circuit case holds otherwise, citing *Frahm v. Equitable Life Assurance Society of United States*, 137 F.3d 955, 959–60 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 55, 142 L.Ed.2d 43, 67 U.S.L.W. 3007 (Oct. 5, 1998). *Frahm* holds that a corporate fiduciary does not breach its fiduciary duty every time a lower level employee provides incorrect advice about a plan; there is no guarantee of accurate information, no "duty of prevision," and no "standard of absolute liability." A fiduciary satisfies its duty of care under § 1104(a)(1)(b) "by taking appropriate precautions-such as training the benefits staff and providing accurate written explanations-even if the precautions sometimes prove to be insufficient." *Id.* at 960. *Frahm* leaves open the question of what may be an inappropriate precaution that could be a basis of liability. *Frahm* is not inconsistent with prior or holdings in the present case regarding the duty to disclose. *See Adamczyk*, 991 F.Supp. at 938–40.

■ Defendant, as a fiduciary, had a duty to provide complete and accurate information in response to questions from beneficiaries, as well as a duty to refrain from affirmative misrepresentations. *Id.* at 940. There can be no claim, however, unless the misinforma-

tion provided or information omitted is material. *Id.* at 939. Information that an employer may offer termination incentives is not material until such incentives are under serious consideration. *Fischer*, 96 F.3d at 1538. Thus, even if a termination incentive is being considered and a member of management expressly denies that such consideration is taking place, this cannot be a basis for a claimed fiduciary violation if the pertinent discussions have not yet reached the level of serious consideration. In other words, there would be a misrepresentation, but it would not be a misrepresentation as to a material fact because a prudent person could not base his or her retirement or resignation decision on possible benefits that had not yet reached the level of serious consideration.

■ Serious consideration exists when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id.* at 1539. *Accord Hockett v. Sun Co.*, 109 F.3d 1515, 1523 (10th Cir.1997). *See also Vartanian v. Monsanto Co.*, 131 F.3d 264, 272 (1st Cir.1997) (modifying the first factor to be: "a specific proposal which would affect a person in the position of plaintiff"). Resolving factual disputes in plaintiffs' favor, it must be determined when the VTP first reached the level of serious consideration, whether any misleading communications were made after that point, and, if so, whether defendant can be held responsible for the misleading communications.

During the pertinent time period, defendant had a group of managers known as the Lever Executive Board. Subject to any requirements of negotiation with the Union, the Executive Board had authority to approve a relocation or provide voluntary termination pay. Members of the Executive Board included defendant's President Charles Strauss, Senior Vice President of Human Resources John Gillespie, and Senior Vice President for Commercial, IT and Supply Chain Stuart Blinder, who was responsible for financial operations.

As early as October 1993, defendant had a strategy that included transferring its Hammond HDL operations to Baltimore. In 1994, the Executive Board established the

HDL Rationalization Team to consider the relocation, including financial implications. In May 1995, the HDL Team first considered offering a separation incentive. On May 13, a written proposal with a voluntary incentive was first produced.[8] Employees working in the offices of members of the Executive Board were involved in considering the proposal. By May 15, an outline for a proposed incentive program had been developed. The voluntary incentive proposal remained on the HDL Team's agenda from mid-May until July 1.

By June 7, Charles Irwin in Blinder's office was already aware that a voluntary incentive was being considered. On that date, he requested that he receive the financial analysis before he began a vacation on July 8. On June 6, consultant Towers Perrin sent to Robert Morissey, in Gillespie's office, estimates of the cost of early retirement. These estimates, however, did not include the $5,000 incentive that was part of the final VTP. On June 14, persons from Blinder's and Gillespie's office met to discuss various options, including voluntary incentives. On July 5, Irwin produced a spreadsheet showing estimated costs of a VTP. No further calculations were made of the estimated costs of the VTP. The July 5 spreadsheet was provided to the HDL Team. The HDL Team met on August 14 and 15 to finalize its recommendations. On August 24, the Executive Board approved the recommendation.[9] This authorized the HDL Team to begin negotiations with the Union subject to the parameters set forth in the approved recommendation.

On August 25, defendant publicly announced the proposed discontinuation of HDL production at Hammond. Mention of the VTP was not included in the public announcement. The Union was contacted on August 25 and negotiations commenced on August 28. On September 18, 1995, an agreement was reached between the two negotiating teams. The agreement included the $5,000 incentive and ordinary layoff benefits. It left open the precise dates for electing voluntary retirement. On September 18, the Union posted notice of a September 19 informational meetings to explain the "negotiated settlement." The notice did not mention the subject of the settlement. That same day, the membership ratified the agreement and the Union and defendant executed the agreement. On November 30, 1995, defendant and the Union sent a joint letter to employees providing more details about the VTP, including specific dates of election.

■ Defendant contends the VTP reached the level of serious consideration either (a) upon approval by the Union on September 18 or 19, 1995 or (b) upon the Executive Board's August 24, 1995 approval of the HDL Team's recommendation. The three elements of serious consideration must coalesce together as a whole. *Fischer*, 96 F.3d at 1539. For there to be a specific proposal, it does not have to be the same as the final version of the plan. It does have to be concrete enough to be considered for purposes of implementation. *Id.* at 1540. The second factor focuses on implementation. Collecting financial analysis and projections is generally part of the preliminary stage. Interaction between upper level management, other personnel, and consultants can also occur during the preliminary stage. Consideration does not become serious until the practicalities of implementation are being considered. *Id.* The last factor focuses on whether the people considering the plan have the authority to implement it. Recommendations by lower level employees generally will not constitute serious consideration; it generally will not be serious consideration until senior management addresses the issue. *Id.*

---

8. Neither party provides a copy of this written proposal. Since the burden to show serious consideration is on plaintiffs, it must be assumed, as defendant contends, that this proposal contained no specifics.

9. Plaintiffs do not point to any evidence that the Executive Board received a copy of the HDL Team's recommendation in advance of the August 24 meeting to consider the recommendation. But even if the Executive Board members received the recommendation in advance, it could not have been more than a few days in advance and certainly not any earlier than the HDL Team's August 15 meeting.

■ Here, the earliest there was any specific proposal appears to be between June 14 and July 5. The practicalities of implementing the plan, however, do not appear to have been considered until the HDL Team met on August 14 and 15 to develop their recommendation. It would be reasonable to infer that, prior to August 24, members of the Executive Board had some interaction with HDL Team members regarding the Team's discussions. However, it was not until August 24 that the Executive Board actually had a formal proposal in front of it and met to discuss it. The evidence, construed in plaintiffs' favor, supports August 24 as the earliest date that senior management seriously considered the VTP. *Cf. Fischer,* 96 F.3d at 1542; *Hockett,* 109 F.3d at 1524; *Vartanian,* 131 F.3d at 272.

All but three of the plaintiffs retired prior to August 24. Since the other seven plaintiffs retired before the VTP was being seriously considered, any information provided to them before they retired could not have been material. The claims of those seven plaintiffs will be dismissed. As to the other three plaintiffs, it must be considered whether there were any misrepresentations made between August 24 and their retirement.

■ Matthew Boyle retired effective September 1, 1995. He states in his affidavit that he spoke to Al Cradle and Jason Smith during various visits to the Human Resources office. The last visit is referred to as being August 1995; he does not identify the specific date. Boyle states that he specifically asked about any incentive packages during a June 1995 visit. He does not contend that he asked any such question in August 1995, only that he was not told of any packages at that time. The nonmovant must provide evidence of specific facts in response to summary judgment. Boyle fails to establish that he had any conversation with Cradle or Smith on August 24 or later. Additionally, he testified at his deposition that he was

aware, before September 1, that negotiations over closure of the Hammond HDL operations had begun and that they might result in an incentive program. Boyle's claim will be dismissed because he fails to establish that he was misled once the VTP was being seriously considered.

Robert Mergesky also retired effective September 1, 1995. He states in his affidavit that, in August 1995, he asked Jason Smith about incentive packages and Smith stated that he had heard of none. Like Boyle, Mergesky does not identify what day in August he spoke to Smith. Therefore, he fails to present specific facts supporting his claim. Moreover, Smith expressly states in his affidavit that the August conversation with Mergesky occurred prior to Smith learning on August 25 that defendant was considering closing the Hammond HDL operations. This statement of Smith stands unrefuted. Mergesky's claim will be dismissed.

■ David Brubaker retired effective October 1, 1995. According to his affidavit, he signed retirement papers on August 17. At that time, he asked Smith about any incentives and Smith responded he had no knowledge of anything specific. On September 20, he again asked Smith and received the same response.[10] A few days before October 1, Brubaker was told by fellow employees that something was going on and he should contact the company. He was not told specifics. In part because of prior statements from Human Resources personnel that no package was forthcoming, Brubaker did not again contact the company. If he had known he could obtain financial incentives by postponing his retirement a couple months, he would have done so.

Smith admits in his affidavit that, on September 18, he learned of the agreement with the Union and the terms of the VTP. On defendant's summary judgment motion, it must be assumed that, on September 20,

**10.** Defendant provides an affidavit from Smith in which Smith states that, on September 20, he told Brubaker that he "could" be eligible for incentives if he delayed his retirement and that Brubaker should talk to the Union. Brubaker's affidavit sufficiently refutes Smith's statement. On defendant's summary judgment motion, Brubaker's statement must be taken as true. Cradle also states that he had two post-September 18 discussions with Brubaker about the VTP agreement with the Union. Again, Cradle's statement is refuted by Brubaker's affidavit. A genuine factual dispute exists as to any September conversations about the VTP.

Smith falsely denied any such knowledge when specifically questioned by Brubaker and that Brubaker relied on Smith's response. Therefore, Smith's response could be a material misrepresentation.

Defendant argues that Brubaker admits he was otherwise aware of the VTP because he admits that other employees told him something was going on. While it could be inferred that these other employees knew of the terms of the VTP and told Brubaker, that is not a necessary inference and Brubaker states that he was only told that something was going on and not told the terms of the VTP. Brubaker states he relied on Smith's misinformation just a few days earlier that nothing specific had yet been agreed upon. It cannot be conclusively determined that such reliance was unreasonable.

Defendant also contends that the Union informed Brubaker of the VTP. However, defendant only provides evidence of a notice of a Union meeting and that the VTP was ratified at the meeting. The notice did not even specifically refer to retirement incentives, let alone describe the terms. There is no evidence that Brubaker was at the ratification meeting and there is no evidence that the Union distributed a written description of the September agreement to its members.[11] Defendant may be contending that knowledge of the Union should be imputed to one of its member, but defendant does not explicitly state this and certainly does not make any argument in support of such a contention. Therefore, it will not be considered. On summary judgment, it must be assumed that Smith made a material misrepresentation to Brubaker.

In *Schmidt v. Sheet Metal Workers' National Pension Fund,* 128 F.3d 541 (7th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1513, 140 L.Ed.2d 667 (1998), a benefit analyst provided the wrong form for designating the beneficiary for a death benefit. *See id.* at 544. It was held that trustees who were fiduciaries could not be held liable for a

breach of fiduciary duty because "no evidence suggests that the Trustees either authorized, participated in, or had knowledge of [the benefit analyst's] misstatement, or that the Trustees deliberately · withheld information from" the benefit analyst. *Id.* at 547. In *Schmidt,* a plan booklet had been distributed to employees which both provided the proper form and clearly stated the method for designating a beneficiary. *See id.* In *Frahm,* benefits counselors provided advice about the plan that was inconsistent with written information that had been provided to participants. 137 F.3d at 959–60. The Seventh Circuit held that the plan's fiduciaries were not bound to comply with these misstatements. *Id.* at 960. The Seventh Circuit indicated that, at most, an ERISA fiduciary has a duty to "take appropriate precautions-such as training the benefits staff and providing accurate written explanations-even if the precautions sometimes prove to be insufficient." 137 F.3d at 960. In *Frahm,* the "district court found (and again the finding is not clearly erroneous) that [defendant] trained its benefits staff to give correct advice." *Id.* at 959.

On Brubaker's summary judgment motion, it must be assumed that, unlike the plans in *Schmidt* and *Frahm,* as of September 20 and October 1, 1995, a written version or summary of the VTP had not yet been distributed to employees, or at least had not yet been provided to Brubaker. Further, as of the pertinent time period, neither side provides any direct evidence as to any instructions that senior management may have provided to Smith or others in the Human Resources Department regarding providing information to employees about the VTP. Smith was one of the people at defendant designated to provide benefits information. He states in his affidavit that he received information about the VTP, but does not state that this communication instructed him to provide this information to employees. Therefore, it can be inferred that he was not so instructed.

11. Smith states in ¶ 16 of his affidavit that, in September, he received a joint letter from the Union and defendant which described the financial terms of the VTP. He further states that he "understood" this letter was posted by the Union. The statement about posting appears to be

based on hearsay, not personal knowledge, and therefore cannot be considered on summary judgment. Moreover, this contention is not included in defendant's Rule 12(M) Statement; plaintiffs were not required to respond to it.

Since, as of September 20 and October 1, senior management neither distributed written information about the VTP nor instructed its staff to provide employees with such information, defendant can be held responsible for Smith's providing misleading responses to Brubaker's September 20 queries.

■ Defendant also contends that Brubaker's claim would fail because he did not timely or adequately exhaust administrative remedies.[12] Defendant relies on an appeal procedure contained in a booklet entitled "Benefits for Bargaining Unit Employees at the Hammond Plant" (the "Booklet"). Only a portion of the Booklet is provided. *See* Exh. A. to Cradle Affidavit. The Booklet apparently summarizes benefits provided to employees under various plans.[13] It also contains an appeal procedure, which is the portion of the Booklet provided by defendant. The VTP itself contains no appeal procedure and makes no express or implied reference to the Booklet. There is no indication that the VTP was included in the Booklet or incorporated into another plan that contains an appeal procedure or that is included in the Booklet. Since waiver or exhaustion is an affirmative defense, *Adamczyk*, 991 F.Supp. at 934, the burden was on defendant to provide evidence of an administrative review procedure being incorporated into the VTP. Since defendant has not provided such evidence, it cannot be entitled to summary judgment on grounds of waiver or exhaustion.

Even if it could be shown that the procedure in the Booklet applied to the VTP, it is still open to question whether Brubaker would be required to exhaust that procedure. Brubaker does not contend that he was entitled to benefits under the terms of the VTP as written-he concedes that he retired too early to qualify for such benefits. Instead, plaintiff contends that defendant violated its fiduciary duty to accurately inform him about the VTP being under consideration. It is unclear whether such a claim would fall under the procedure described in the Booklet since it is not a direct claim for benefits under the VTP.[14] This issue need not be resolved since defendant's exhaustion defense otherwise fails on summary judgment. Additionally, even assuming the appeal procedure in the Booklet applies to plaintiff's claim, no opinion is expressed regarding plaintiff's contention that he either fully and timely exhausted those procedures or any additional procedures would have been excused because futile.

Citing *Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1437 (7th Cir.1996), defendant contends that Brubaker must show that the denial of benefits was arbitrary and capricious. *Trombetta* follows the holding in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), that court review of the denial of benefits is *de novo* unless the plan provides the fiduciary with discretion to determine eligibility for benefits. Defendant, however, does not point to any language in the VTP providing *defendant* with such discretionary authority.[15] The arbitrary and capricious standard will not be applied.

12. The remaining contentions were made as to the claims of all plaintiffs. However, since the claims of the other plaintiffs are subject to dismissal on other grounds that have previously been discussed, the remaining discussion will refer only to Brubaker and a single plaintiff.

13. The portion of the Booklet provided makes repeated reference to "the Plans." The "Plans" referred to are administered by the Benefits Administration Committee ("BAC"). The VTP makes no reference to the BAC.

14. The Booklet refers to "an obligation to make a claim for benefits under the Plans." It also refers to rights and claims being limited to those "outlined in the applicable Plan." On the other hand, it also provides: "The BAC has discretion-

ary authority to interpret and construe the terms of the Plans and, in general, to decide any matter arising under the Plans." Additionally, the Booklet expressly provides that the language of the Plans themselves will control if in conflict with statements in the Booklet.

15. As indicated above, there is language in the Booklet referring to the BAC having discretionary authority. However, as previously discussed, it cannot be assumed for purposes of summary judgment that the procedures set forth in the Booklet apply to the VTP. And, even if those procedures do apply to the VTP, it is not clear that the standard of review for BAC benefits determinations would apply to a breach of fiduciary duty claim made directly against Lever Brothers.

Last, defendant contends that plaintiff cannot be entitled to any relief because relief under 29 U.S.C. § 1132(a)(3) is limited to equitable relief, which does not include monetary relief in the form of compensatory damages. *Mertens v. Hewitt Associates,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Equitable relief, however, can include monetary relief. *See Health Cost Controls v. Skinner,* 44 F.3d 535, 537 n. 5 (7th Cir.1995); *Blue Cross & Blue Shield of Alabama v. Sanders,* 138 F.3d 1347, 1352 n. 5 (11th Cir.1998); *Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 661 (6th Cir.), *cert. denied,* 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). Brubaker's claim may properly be characterized as an equitable claim for modification or amendment of the VTP that would permit him to qualify for VTP benefits even though he retired on October 1, 1995. *Cf. Cartelli v. Plumbers & Steamfitters Local Union Number 422 Pension Fund,* 1992 WL 373054 *2 (N.D.Ill.Dec. 7, 1992) (under certain circumstances terms of a plan may be equitably modified based on equitable estoppel); *P.I.A. Michigan City, Inc. v. National Porges Radiator Corp.,* 789 F.Supp. 1421, 1424 (N.D.Ill. 1992) (same). As relief for the misrepresentation made to him, the time period for election or qualification could, in effect, be equitably modified. Alternatively, Brubaker's claim possibly could be characterized as a claim for benefits pursuant to § 1132(a)(1)(B). Brubaker's claim will not be dismissed for lack of a possible remedy.

Plaintiffs also plead state law claims. However, those claims were only raised as alternative claims in the event it was held that the VTP was not an ERISA plan. Since evidence that is uncontested by either side shows the VTP is an ERISA plan, the state law claims are preempted by ERISA.

Plaintiffs also move for summary judgment. On Brubaker's motion for summary judgment, Smith's statements regarding his September 20, 1995 conversation with Brubaker must be taken as true. Therefore, on Brubaker's motion for summary judgment, it must be assumed that he was adequately informed about the VTP prior to retiring and that he could have chosen to delay his retirement in order to qualify for VTP benefits.

Brubaker is not entitled to summary judgment. As to all the other plaintiffs, the grant of defendant's motion for summary judgment makes it clear that they are not entitled to summary judgment.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [52–1] is granted in part and denied in part. All claims are dismissed except plaintiff David Brubaker's ERISA claim. All plaintiffs except David Brubaker are dismissed from this action. Plaintiffs' motion for summary judgment [65–1] is denied. In open court on December 6, 1998 at 9:15 a.m., the remaining parties shall present an original and one copy of a topbound final pretrial order in full compliance with Local Rule 5.00.